## JOHN F. MCKINNEY v. JOSEPH O'CONNOR.

Where it appears from the returns of an election, that the person who acted as presiding officer and signed such returns is a different person from the individual appointed by the County Court to be the presiding officer, it is the certificate of the managers of the election that such individual so appointed failed to attend or refused to act, and that the person acting was duly chosen by the electors present, which is made by the statute (Art. 627, O. & W. Dig. 152,) the evidence of the authority of the person so acting to hold the election.

It is also such certificate of the managers which invests the person so acting as the presiding officer with the authority to make a return of the election which shall of itself import the same degree of verity as though made by the regular appointee of the County Court. Without such certificate, the return does not of itself import such verity.

The statute regulating elections, above cited, has prescribed but one mode, to wit: the certificate of the managers to the effect aforesaid, of authenticating the authority and acts of a person officiating as presiding officer of an election in place of the regular appointee of the County Court.

The constitution confers the right to vote upon a "qualified elector," and provides that "all elections by the people shall be held at such time and places in the several counties, cities or towns, as are now, or may hereafter be designated by law." (Art. 3, Sec. 1 & 7, O. & W. Dig. 15.) The essential matters to constitute an election are that a time and a place should be designated by or according to law; and that the qualified electors should then and there actually hold an election.

The statutory rules prescribing the manner in which the qualified electors shall hold the election, and the mode in which their act shall be so authenticated as to import verity on its face, are directory; and irregularities in their observance will not vitiate an election, unless they be such that the true result of the ballot cannot be ascertained with reasonable certainty.

The ultimate test of the validity of an election is determinable by the question, did the qualified electors, acting in concert, hold an election at the time and place designated, and in a manner so far in conformity to the law that the true result can be arrived at with reasonable certainty.

Presupposing the proper transmission to the Chief Justice of the county of the return of an election, if it bears upon its face the name of the presiding officer regularly appointed by the County Court, the certificate is *prima facie* evidence that he acted in that capacity, and that the facts stated in and implied by the return were true; and a contestant seeking to controvert the facts so evidenced must disprove them by extrinsic evidence.

But a return bearing the name of a person as presiding officer who is unknown in that capacity to the Chief Justice and the County Court, and

John F. McKinney v. Joseph O'Connor.

which does not contain the certificate of the managers required by law, is no evidence of the authority of such person, or of the other facts stated in or implied by such return. A contestant claiming the benefit of such a return must sustain it by extrinsic evidence establishing a substantial compliance with the requirements of the law in the holding of the election, and identifying the return in question as the act of the persons recognized by the qualified electors as the officers of the election. The measure of proof necessary in such case considered, and held to be indefinable.

Officers *de facto*, how constituted : Their acts valid when they concern the public or the rights of persons interested in the thing done; and their title to the office not to be impeached collaterally.

Under the statute, (Art. 452, O. & W. Dig. 120,) a party has a right to take out his commission to take depositions on the fifth day after notice given of the filing of his interrogatories : If the cross interrogatories are not embraced in a commission taken out on that day, it is to be presumed that they were not filed when the commission was issued; and their omission is not a valid objection to the depositions taken under such commission.

If necessary to invest the District Court with jurisdiction over the subject matter in controversy in this cause, to wit, the office of District Judge, judicial cognizance, as a matter of law, will be taken that the office is lucrative to an extent sufficient to sustain the jurisdiction.

The right in controversy is either a full right to the office, conclusive as between these parties; or it is a *prima facie* right to the commission, and a present right to exercise the office, not conclusive of the full right should the parties resort to a common law remedy to enforce and obtain the full right. Which of these rights is involved in this litigation is not decided, it not being necessary to the disposition of this cause.

Quaere? Whether in proceedings of this character, the right of trial by jury exists? Whether the mode of proof in such proceedings is by depositions alone? Whether the judgment upon such proceedings is conclusive of the full right to the office? Other questions, pertinent to this particular case, but not of general application or interest, raised, but not decided, in the opinion of the court.

The jurisdiction of the District Court and that of this Court, derivatively by appeal, being called in question : *Held*, that the District Court, as a court of original jurisdiction, and the Supreme Court, as an appellate court, have a right to hear and determine causes instituted under the statute (Art. 659, O. & W. Dig. 157,) for the trial of the right to the office of District Judge.

See this case for the principles applicable to contests of elections arising out of defective and false returns ; and also for the rules of evidence and methods of proof in relation to fictitious or fraudulent voting.

APPEAL from Victoria.    Tried below before the Hon. Fielding Jones.

John F. McKinney v. Joseph O'Connor.

This was a proceeding instituted under the statute by the appellee to contest the right of the appellant to the office of District Judge of the 14th Judicial District, composed of Nueces and other counties, for which office an election was held at the general election in August, 1860.

The facts stated fully in the opinion of the court.

*R. Hughes*, for appellant, contended that the jurisdiction given by the statute for the adjudication of causes of this character was vested, not in the District Court, but in the District Judge of the nearest adjoining district, as a special authority. Having cited several sections of the statute (O. & W. Dig. 157, Art. 659, *et seq.*,) in support of his position, he proceeds : If it had been the intention to give jurisdiction to the District Court instead of authority to the judge, it would have been left upon the general principles applicable to the°district courts, and to be tried when the parties were ready for trial, subject to application for delay, or continuances for want of evidence or other causes.

But this is not an ordinary case. The State and the citizens in the district, as well as the parties contestant, were and are interested in all such contests; and therefore this court have determined that it was the policy of the government that "these disputes for office should be summarily and promptly settled." (Lindsey v. Luckct, 20 Tex. R. 520–1.) And consequently the law was so framed as to subject it to the rule as to special jurisdiction.

Again by section 19 it is declared: "The trial of every contested election shall be *by the* judge; and upon depositions taken in the mode prescribed in the act." Why necessary to state, and restate so often, that the trial is to be by the judge? Clearly to show that it was not a case to be tried by the rules of the common law, if upon an issue of fact by a jury, and if upon a question of law by the court. The judge was therefore designated for the performance of a particular duty. And it was clearly not within the range of his ordinary duties of office ; for the facts upon which the contest arises, and the parties to such contest, are not subject to his jurisdiction—all being not only in another county, but also·

of another district.  This court say in a case of contested election for the location of a county seat, "As to this election, the statute confided to the officer a personal trust distinct from his ordinary official duties, an independent personal authority, limited to one express object, and to be exercised according to the dictates of his own judgment upon the law.  When he had exercised his authority and finally disposed of the subject, his authority was *functus officio*.  By its exercise it was exhausted."  "The authority here conferred was in the nature of a special commission, which was determined by the performance of the act to which it extended: it did not constitute the officer a judicial tribunal, or inferior jurisdiction within the meaning of the Constitution, (Art. 4, Sec. 10,) that has reference to those inferior tribunals constituted to administer the justice of the country, and whose proceedings are according to the course of the common law."  "That it was the Chief Justice of the county who was empowered to act in this case, did not change the character of the authority conferred.  The duties imposed by the Act had no connection with his official duties as Chief Justice, and might have been required of any private person."  (Asbury v. Beavers, 6 Tex. R. 469.)

The application of this is direct.

*G. W. Paschal* and *C. S. West*, for appellee.

ROBERTS, J.  In the counties composing the Fourteenth Judicial District, an election for the office of District Judge was holden on the 6th day of August, 1860.  By the returns made to the office of the Secretary of State from the respective counties in said district, appellee, O'Connor, received 676 votes, and appellant, McKinney, received 483 votes, and other candidates received a smaller number.  These returns are in due form, except as to 22 votes given to O'Connor at a place which had not been designated as an election precinct by the County Court of Nueces county, and as to which there is a special separate return by the Chief Justice of said county.  There was no evidence going behind this special return tending to show that the people did assemble and

appoint a returning officer, and that he appointed managers and clerks, and proceeded to hold the election regularly, by receiving the votes of legally qualified electors of the district.

If for that reason these 22 votes should be excluded, there appeared still for O'Connor a majority of 171 votes. Notwithstanding this, for some reason not now necessary to be adverted to, McKinney received a certificate of election from the Governor of the State. O'Connor filed in Victoria county his petition for a contest of the election, as thus determined, and served a notice upon McKinney. In this petition O'Connor based his right to the office upon the fact, that he had received the greatest number of votes in said election, which was evidenced by the returns in the office of the Secretary of State.

McKinney filed his defence, in which he denied this fact; and for the purpose of controverting the returns which evidenced it, he alleges that the returns of election from precinct No. 9, made to the Chief Justice of Nueces county, were the result of a fraudulent conspiracy to defeat the popular will in said election ; that said precinct was created at a special term of the County Court about a month before the election; that its creation was concealed from, and remained unknown to the public; that the notice of the election given by the Chief Justice did not designate the place of holding the election; that "a return was made of the election, as if there had been properly polled three hundred and fifteen votes, (of which three hundred and thirteen purport to be given to O'Connor;") that "such result was attained by means which must have been fraudulent, as may be inferred from the following facts: The men present, not of Mexican origin, numbered about half a dozen; the men present of Mexican origin numbered less—probably much less, than one hundred; and that the whole number of those present who would have been entitled to vote had the precinct been legal, did not exceed twenty." By an additional answer, the same allegations were made to apply to the validity of the election in precinct No. 8 in the same county.

By these answers the defendant below gave notice that he would assail the validity of the election in precincts 8 and 9, as returned to the Chief Justice of Nueces county, not only upon the ground

of illegality and fraud in holding the election at those places under all the circumstances, but also upon the ground, that but few of the men whose names appeared upon the returns as having voted at precincts 8 and 9, were actually present, and that most of those present were not entitled to vote.

Upon the trial of the issues thus formed, the plaintiff introduced in evidence a copy of the returns from the several counties in the Fourteenth Judicial District, certified to by the Secretary of State. And it being agreed that McKinney had received the certificate of election, and had acted as Judge under said certificate, the plaintiff below closed his testimony.

To meet this *prima facie* case, the defendant proved the allegations in relation to the creation of the precincts 8 and 9, and notice of election in Nueces county, and also read in evidence certified copies of the poll-books of the election in the several precincts of said county. The return of the election in precinct 9 was not legal. The County Court had appointed John Vale the presiding officer, and in the return of the election of that precinct, Rafael F. Salinas appeared as the presiding officer, and the persons purporting to be the managers of the election failed to certify, as required by the statute, that the presiding officer, John Vale, failed to attend, or refused to act, and that the person acting, Rafael F. Salinas, was duly chosen by the electors present. (Art. 627, O. & W. Dig. 152.)

Such certificate is made the evidence of his authority to hold the election, received from, or acquiesced in by the persons present, and also vests him with the authority to make a return of the election, which shall of itself import the same degree of verity in regard to his acts as though made by the regular presiding officer, whose appointment has been recorded in the minutes of the County Court. Without such additional certificate the return does not of itself import such verity. Or, in other words, the statute regulating elections has prescribed one, and but one mode of authenticating the authority and acts of a third person who fills the place of the regular appointee of the County Court, and that mode has not been attempted to be adopted. As this return gives O'Connor three hundred and thirteen votes, and as its rejection for illegality

John F. McKinney v. Joseph O'Connor.

would change the result of the election by giving McKinney the greater number of legal votes, it is important here to consider how the facts contained in this return may be established so as to give O'Connor the benefit of the three hundred and thirteen votes, which he cannot get by virtue of this defective certificate alone—upon whom rests the burden of establishing such additional facts to sustain said return, and whether or not it has been done in this case.

The Constitution confers the right to vote upon a "qualified elector," and provides that "all elections by the people shall be held at such time and place in the several counties, cities or towns, as are now or may hereafter be designated by law." (Art. 3, Sec. 1 and 7, O. & W. Dig. 15.) The essential matters to constitute an election are, that a time and place should be designated by, or according to the law; and that the "qualified electors— the people," should then and there hold an election. To facilitate the proper exercise of this right, the Legislature has established rules regulating elections. (O. & W. Dig. 151.)

Such rules prescribing the manner in which the qualified electors shall hold the election, at the time and place designated, and those prescribing the manner in which their act, when done, shall be authenticated, so as to import verity on its face, are directory. Irregularities in their observance will not vitiate an election, unless they be such that the true result of the ballot cannot be arrived at with reasonable certainty. The ultimate test of the validity of an election, is involved in the questions : did the qualified electors, at the time and place designated, acting in concert, either actively, or by acquiescence, hold an election and cast their votes in the ballot box; and has it been done in a manner sufficiently conformable to the directions of the law, as that the true result can be arrived at with reasonable certainty. (The People v. Cook, 14 Barbour's N. Y. Rep. 259.)

Had the return in precinct No. 9 borne upon its face the name of John Vale as presiding officer, the certificate would have been, in and of itself, *prima facie* evidence that he acted in that capacity, that he appointed managers and clerks, and that an election was held at which O'Connor received three hundred and thirteen votes of qualified electors. That such return had been properly trans-

mitted to the Chief Justice, is here presupposed. Had McKinney sought to controvert any of these facts thus authenticated, he must have assumed the burden of proving by extrinsic evidence that John Vale was not present, or did not act, or that no such an election was in fact then and there held, or that all, or a part of the three hundred and thirteen votes were cast by persons who were not qualified electors, or that only a part of that number of votes were actually cast.

But the return bearing the name of Rafael F. Salinas as presiding officer, a person wholly unknown in that capacity to the Chief Justice or to the County Court, and not containing the required certificate, is of itself no evidence that Salinas was chosen by the qualified voters to act in the place of Vale, or that he assumed to act, they acquiescing therein, and that an election was held then and there, and that three hundred and thirteen votes were cast for O'Connor by qualified electors. If O'Connor wished to obtain the benefit of this vote, it was incumbent on him to go behind the return, and sustain it by extrinsic evidence that the people did then and there hold an election in which they recognized Salinas as the presiding officer, or in which they recognized Salinas, and the other persons named, as the managers of the election, and that this is their return of it. (The People v. Cook, 14 Barb. N. Y. Rep. 259. Same case, 4 Selden R. 67.)

It might not have been incumbent on him to prove that every one, or even most of the votes were cast by qualified electors, to have gotten the benefit of the whole vote. But, considering the charge of McKinney that there were less than one hundred persons present at said election, and of that number that there were less than twenty qualified electors, it was reasonable to expect that O'Connor would sustain this defective return, by showing at least that Salinas and others acted as managers, and that a considerable number of qualified electors were present, recognizing them as such by casting their votes, and that this was a genuine return made by these persons. The exact measure of proof that may be necessary in such a case cannot be defined. It must reasonably satisfy the mind that an election was actually held, and that

this paper emanated from the persons who held it, as the evidence of their acts.

There was no evidence whatever adduced in relation to any thing pertaining to the election in that precinct, by the testimony of any witness who was present at the place of holding the election. The only thing tending in that direction, is the statement in the answer of McKinney that Charles Lovenskiold and Richard Miller acted as Judges, and that the number of qualified electors present did not exceed twenty. The names of said Lovenskiold and Miller appear on the return as the "judges." This admission is directly connected with, and constitutes part of the charge that the return was fraudulent and false. But if it be regarded abstractly, and the same force be given it as if O'Connor had proved those isolated facts, it is hardly sufficient to establish the validity of the election. If O'Connor had sought to make proof on this subject, and had failed to prove any more than that two out of the three managers had acted, and that twenty qualified voters were present, without any proof as to the manner of creating the officers of the election, and without any proof of their recognition by the qualified electors, and without any proof that any one single person did actually deliver his vote to be deposited in the ballot box, and without any proof that this return was actually made by the persons as officers, whose names appear on it as such, it would have been meagre indeed to establish satisfactorily that a regular election had been held.

A similar case was presented by a return in The People v. Cook, above quoted, which was signed by Ames, Beardsley and Weston, the names of three persons who had not been appointed inspectors of election. Said return had been rejected, and in order to sustain it, evidence was adduced on the trial that the signatures were genuine; that it was the only return from that district; that a certain witness was present from the opening to the closing of the polls; that the persons who signed the returns officiated as inspectors all day; that no question was raised by any one as to their right to act; that no body claimed to be inspectors that day except these men; that the question as to who were inspectors, was talked of in the morning before the polls were

opened; that it was conceded on all sides that Ames was an inspector; that he was sent for, came, and proceeded to organize the board, acting as inspector; that he appointed the others; that they appointed clerks of the polls, and that oaths were administered. Upon this proof the court permitted the return to be read in evidence, as being sustained by its being shown that the persons were officers *de facto*. And it was held that "the acts of officers *de facto*, are valid when they concern the public, or the rights of third persons who have an interest in the thing done, and that their title to the office cannot be enquired into collaterally."

It will be perceived that they were not held to be officers *de facto*, by virtue of their names appearing as officers on the return; but by force of the evidence *aliunde*, satisfactorily establishing that a regular election was held, and that they acted just as if they had been the proper officers; that they were recognized as such by the persons present, and that this return was certainly made by them as their act in that capacity.

It may be that the defect in the proof to sustain this return may be attributable to the fact that this objection to it was not specifically made, although it was alleged to be fraudulent. Therefore, without making the case turn on this point, as the parties have not done so on the trial, it is proper now to consider the objection to it directly made in substance, to wit: that it embraced the names of many persons who were not present and did not vote, and of many others who had no right to vote.

The same objection is taken to the return of the election in precinct No. 8. This latter return was regularly made by the presiding officer appointed by the County Court of Nueces county.

Upon this charge of illegal and fictitious votes in the returns from precincts 8 and 9, the burden of proof rested on McKinney. To establish it, he offered the testimony of eleven witnesses, whose depositions had been taken. Several objections were taken to these depositions, which were correctly overruled. One objection was, that the commission to take the depositions of McKinney's witness did not embrace the cross interrogatories filed by O'Connor on the evening of the fifth day after the notice given of the filing of the interrogatories. Under the statute, McKinney had a right to take

out his commission on the fifth day, and as the cross interrogatories were not included, it must be presumed that they were not filed when the commission was issued. (O. & W. Dig., Art. 452.) Another objection was, that T. E. Hooper, who acted as commissioner in taking the depositions of Martin Ynojosa, "did not understand the Spanish language," it being shown that Ynojosa did not understand English. The statute authorizes the court to appoint an interpreter when necessary. (O. & W. Dig. 566.) No such provision has been made in taking depositions, and we must presume that the officer did his duty, unless this testimony had been attacked in some more direct way than was here attempted.

This evidence is circumstantial for the most part. The witnesses are shown the list of voters in precincts 8 and 9, and state, as to each name consecutively, what they know, if anything, about the person being a qualified voter. Some of the witnesses knew, or had heard something of as many as eighty-three, and others a less number, of the persons on the poll lists. One witness knew as many as fifty-four who may be presumed to be qualified electors, and twenty-seven not good. One witness knew fifty good and thirty-three bad. These witnesses both had Mexican names, and knew or had heard of more of the persons on the lists than any other witnesses. Nearly all the names on both lists were Mexican. The number of persons on the two lists, that all the witnesses together knew or had heard something of, was one hundred and fifteen; that is, 25 on the list of precinct No. 8, and 90 on No. 9. These figures are arrived at from the estimates submitted by the counsel on both sides, in connection with the evidence in the statement of facts. It was shown, that precinct No. 9, where most of the votes was returned from, was remote from Corpus Christi, being 60 or 70 miles distant.

One of the witnesses, J. M. Ynojosa, states that he has lived in Nueces county for twenty years; had been employed in stock-raising and working about for hire; is generally acquainted with the ranches and Mexican population of Nueces county and the adjoining counties; and, upon looking at the lists of Nos. 8 and 9, he identifies about 64 names of persons that he knows something of—35 good and 29 bad voters; and as to the rest, he says he

never heard of them; and further, that he had never heard of so many Mexican voters being in this (14th) Judicial District, west of the Nueces river, and does not think they can be legal voters.

A. witness, Antonio Caviero, states, he has resided in Nueces county ever since the war with Mexico, and before annexation; that he is a wheelwright; that he is generally acquainted with the people of Nueces county, and with most of the ranches in that and the adjoining counties west of the Nueces river, either personally or by reputation; that he has been employed in his trade in a great many of them; and upon referring separately in his answers to every name upon both lists, he is able to identify eighty-one that he knows something of—54 good and 29 bad voters; the rest he does not know. And he further states, that it is impossible for so many men to have lived in Nueces county, and to have been legal voters, without my knowledge, or in the adjoining counties; there might have been a few, say six or seven, legal voters of those I don't know, but could not have been more."

William Ashton states, that he has lived here since 1852; is a horse-trader; has a general acquaintance with the people of Nueces county, and with the ranches and Mexican population of the adjoining counties; and after identifying 28 good and bad voters, says, he does not know the rest, and that he does not think it possible for that many (meaning the whole on the lists) to be legal voters without his knowledge.

Samuel L. Miller states his general acquaintance, &c., from having traveled a great deal over the county and adjoining counties, hunting stock and trading; and after identifying 33 good and bad, says, he does not know, and never heard of the rest; and further, he says, "from my knowledge of the inhabitants of Nueces, Duval and Encinal, I know that there is less than two hundred legal Mexican votes in them." (There were numerous Mexican names on the poll-books of other precincts in Nueces county besides Nos. 8 and 9.)

Juan Ynojosa states his general acquaintance, &c., identifies 48 good and bad votes, and says, that he does not think it possible for so many legal voters to have voted at precincts Nos. 8 and 9 without his knowing more of them.

John Kellett states his general acquaintance, &c., as the others; and after identifying 34 good and bad voters, says, "I know that the part of the 14th Judicial District west of the Nueces river has not one hundred and fifty legal voters in it, and don't believe there is past fifty legal Mexican voters in that part of the district."

H. M. Berry states his general acquaintance, &c., as others; is a tavern-keeper, and was Assessor and Collector of taxes in 1851-2-3-4, and says, "there are not to exceed one hundred legal Mexican voters in the whole county of Nueces."

H. L. Kinney states his general acquaintance, &c.; being the oldest settler in the county, identifies 50 good and bad voters; does not know, and never heard of the rest, and says, "I am satisfied there are not fifty legal voters to vote at that precinct, (No. 9,) from my own knowledge."

George Noessell states his general acquaintance, &c., and states, that as to precinct No. 9, he does not believe that there could be half the number of legal voters brought to that precinct.

George Pfueffer states his general acquaintance, &c., as the others, and says, "from my knowledge of the Mexicans in this and the adjoining counties, and from the names of voters on the poll-lists of precincts Nos. 8 and 9, I am certain there are not seventy-five legal voters among them."

William Driver knows but few, his acquaintance not being general, &c.

Martin Ynojosa is 28 years old; has lived in Nueces all his life; raises cattle and horses, &c.; and is generally acquainted with the people of Nueces county, and among the ranches in the new counties, and with the Mexican population in Nueces and the new counties, he identifies 83 good and bad voters, and knows nothing of the rest.

In addition to this general proof, the witnesses identify the names of persons whom they know on the lists 8 and 9 to be illegal voters from various reasons. For instance, this last witness, who is able to identify more than any other, recognizes ten or fifteen who came from Mexico within the last five years; thirteen who lived on the Rio Grande, or in Mexico, on the other side of the

2

river; five as persons under 21 years of age, some of them mere
boys; one that he knows was not at the election; one name men-
tioned three times, when he knows but one person of that name,
and four others such mentioned twice.

The witness, Antonio Caviero, who identifies the next greatest
number on the lists, recognizes the names of ten persons whom he
knows to be residents upon the Rio Grande, or of Mexico ; seven
who have left Mexico less than five years; three who are under
twenty-one years of age; five whose names appear twice; two who
did not go to the polls on the day of the election; one dead; and
one who had run away four years before, and whom he had not
heard of since.

This will suffice to show the character of the testimony of the
witnesses on this subject.

There is a striking circumstance, also, in the order in which the
names appear, which the witnesses recognize on the poll-book in
precinct No. 9.   Those whom they know are distributed through-
out the whole list, very regularly, at intervals between from three
to ten who are not known.

To rebut this evidence, O'Connor placed Henry A. Gilpin upon
the stand, whose oral examination was permitted by the Court,
upon objection thereto being overruled.   He stated that he had
been a resident citizen of Nueces county, or that part of Texas,
since 1845, and had been acquainted with it at different times
since 1830; that he was generally acquainted with the Mexican
population of Nueces and the adjoining counties, and particularly
with that of Nueces; that he speaks the Spanish language, and
derived his information as to the Mexican population from his inter-
course with them as a merchant, from 1845 to 1857, and his official
relations with them, having been Chief Justice of the county;
that he believes that there were between five and six hundred legal
Mexican voters within the limits of old Nueces county at the elec-
tion in 1860; that he is somewhat acquainted with the district of
country about Vale's ranche, having passed through it some time
before the last August election, and that there are several large
ranches in the vicinity, and that part of the country is settling up.
He was, upon cross-examination, referred to the poll-book in pre-

cinct No. 9, as the other witnesses had been, and was able to recognize upon it fewer persons than several of the other witnesses, and among them, two lived upon the Rio Grande. One of the persons shown by other witnesses to be under twenty-one years of age, he thought was of full age, and knew he was over eighteen years of age.

In determining the weight of the whole of this testimony, it should be borne in mind that there were about seven hundred votes returned from Nueces county in this election, and that 315 of them were returned from a remote ranche, sixty or seventy miles from Corpus Christi, which had been established as precinct No. 9, at a special term of the County Court, when only three or four persons were present, and not more than a month before the election, and whose establishment, if not concealed, was certainly not extensively known in other parts of the county. The county of Nueces, with the new counties connected with it for judicial purposes, comprised a large territory; and the occupation of the people, from its nature, requiring them to be sparsely scattered over the country, an assemblage of three hundred and fifteen persons to vote at Vale's ranche, would have constituted the occasion so notorious that it would have been very easy to establish it by the direct testimony of many. They would only lack forty-five more to have had present at that one place, one-half of all the voters of the county. The place was sixty or seventy miles from Corpus Christi, in the direction of the Rio Grande, where some of the persons on the list were proved to reside. The returns from no other precinct in the county, except those of No. 1, exhibited more than forty-five votes. Upon an examination of the poll-books from all the other precincts, a good proportion of Mexican names will appear, by which it is made manifest that all the Mexican population of the county did not retire to that place to vote. It was proved by several of the witnesses that some of the names on poll-book No. 9 were those of persons who lived in Corpus Christi, who must have known, if they were there, whether or not so large a number of persons had assembled at Vale's ranche. The depositions of one of them, Felix A. Blucher, were taken by O'Connor, and not a word was asked him as to what took

place at Vale's ranche on the day of election, or how many persons were there during the day. He was the very man to have developed the whole transaction, for it was shown that he was an old citizen of the county, and two of the witnesses proved that the poll-book of precinct No. 9 was in his handwriting. The names of the clerks of the election were Mexican, (Antonio de la Garza and Calixto Tovar,) and as the poll-book is in Blucher's handwriting, he must have found it necessary to assist them, perhaps from their want of facility in writing in the English language, or from some other cause, and by this means he was peculiarly in a situation to furnish a full explanation. There were, also, Messrs. Lovenskiold and Miller, managers of the election, who were shown to be well known citizens of the county, and who were directly charged with assisting in manufacturing a return which was fraudulent, because of the illegal and fictitious votes embraced in it;—they would have been competent witnesses, and, from their position, capable of explaining the whole transaction.

The question of fact is, were there illegal and fictitious votes enough embraced in these returns to change the result of the election, and does the evidence satisfactorily establish it?

This charge was directly made by McKinney, and it constituted the main issue of fact, upon which testimony was to be taken on one side and met on the other; and so it must have been regarded by both parties. It is not only expressed in the pleadings, but also plainly indicated in the interrogatories propounded to the witnesses. Ten witnesses, citizens of the county, some of them among its oldest inhabitants, and some of them Anglo-American, others, of Mexican origin, state that they are well acquainted with the people, including the Mexican population of Nueces and the adjoining counties, stating their means of knowledge amply; and state all the persons on these lists that they know, and those they do not know. Uniting their combined knowledge, they can recognize but about one hundred and fifteen, and there are on the lists two hundred and thirty-four names of persons that they swear they never knew or heard of. When the notorious fact is considered that persons know each other at a great distance just in proportion to the sparseness of the population, is it possible that there could

have been two hundred and thirty-four qualified electors,—citizens of Nueces and the attached counties, whom no one of these ten witnesses ever knew or heard of, and whom Gilpin, the witness of O'Connor, did not know anything of? Or, in reference to precinct No. 9, alone, the witnesses knew, or had heard something of ninety of the persons named on the list, and did not know, and had never heard of two hundred and fifteen. Now, can it be believed that there were two hundred and fifteen citizens, qualified electors, in attendance upon the election that day at Vale's ranche, who are wholly unknown to ten citizens of the county, who swear that they have a general acquaintance with the people in that, as well as in other parts of the county of Nueces, and of the attached counties? Such a thing is possible, but it is very far from being probable. Their evidence raises a very strong presumption in favor of the truth of the charge, that this return from precinct No. 9 was fraudulent and false; and that is still increased by the entire failure to rebut it, when it would have been so easily done had the necessary facts existed. If the whole number at precinct No. 8, and the whole number that all the witnesses could recognize on the lists of precinct No. 9 be allowed to O'Connor, which is more than the evidence would justify, he would have from those two precincts about one hundred and twenty-four. And if that number be substituted in his list of votes for three hundred and forty-seven, which were returned from those two precincts, it will make McKinney's vote exceed his by at least thirty votes. And if the twenty-two votes cast for O'Connor, at a place not designated by the County Court, be rejected, it will increase McKinney's majority to about fifty-two. It may be proper to remark, that the decision would have been much more satisfactory, had the evidence of the parties been more direct. They have the right to select their own mode of arraying their testimony. We must decide the case as we find it.

One other question of law remains to be considered. Can the District Court take jurisdiction of this case as a judicial proceeding, and can this court entertain and act fully upon the appeal from that court? The jurisdiction of the District Court is conferred by the Constitution, and among other things is made to

embrace "all suits, complaints, and pleas whatever, without regard to any distinction between law and equity, when the matter in controversy shall be valued at, or amount to one hundred dollars, exclusive of interest." There was no question made below about the value of the subject matter in controversy, and if it be necessary to give the court jurisdiction, it is known as a matter of law, that the office is lucrative to an extent sufficient to give the court jurisdiction.

There is a right to be determined upon hearing the evidence. That right is either a full right to the office as between these parties, conclusive in its character as to them; or it is a *prima facie* right to the commission, and a present right to exercise the office, not conclusive of the full right should the parties resort to any common law remedy to enforce and obtain the full right. (Womack v. Holloway, 2, Ala. R., 31.) As to whether it is the one or the other right, is to be arrived at by a construction of the statutes giving the remedy in connection with the subject matter. In either point of view, the principal objection to its being a judicial proceeding is, that the statute does not include in the remedy a trial by jury. But as a statute furnishing a remedy for a right may be unconstitutional in part, and sustained as to the balance, this objection may be obviated, if thought to be necessary, by bringing the clause of the Constitution guaranteeing a jury trial, in aid of that part of the law, being paramount thereto. In other respects in which there may be no constitutional inhibition, the remedy, as well as the character of the right to be litigated, may be regulated by the Legislature. In addition to a right to be determined, there are parties having an interest in the right, regularly brought into court to prosecute and defend. It has the characteristics of a judicial proceeding. (7 Hill R., 10, Striker v. Kelly.) That is all that is necessary for us now to decide to give the District Court original, and the Supreme Court appellate, jurisdiction of the subject matter of this cause.

From the course pursued upon the trial, and from the view of the law and the facts taken by us, it has not become necessary to decide the legality of the creation of precincts 8 and 9, in Nueces county, the effect of attaching the new counties to Nueces, for

judicial purposes, the legality of the notice of election, the right to a trial by a jury in the case, the right to have the case decided upon depositions alone, and whether or not this judgment is conclusive of the full right to the office as between the parties.

We decide, as matter of law, that the District Court as a court of original jurisdiction, and the Supreme Court as an appellate court, have a right to hear and determine the cause; and, as matter of fact, from the evidence adduced on the trial, that McKinney received the greater number of legal votes of qualified electors at the election on the 6th day of August, 1860, in the 14th Judicial District.

The judgment of the District Court is therefore reversed, and judgment will be rendered here in accordance with this opinion.

Reversed and reformed.