**Brian Thomas KNOWLES, Petitioner,**

v.

**Honorable Bob SCOFIELD, Judge, 158th Judicial District Court, Denton County, Texas, Respondent.**

No. 64432.

Court of Criminal Appeals of Texas, En Banc.

April 30, 1980.

Rehearing Denied June 4, 1980.

George A. Preston, Alan Levy, William E. Trantham, Denton, for petitioner.

Jerry W. Cobb, Dist. Atty. and Fred Marsh, Asst. Dist. Atty., for respondent.

Robert Huttash, State's Atty., Austin, for the State.

## OPINION

CLINTON, Judge.

This is an original action for writs of prohibition and mandamus. Facing an imminent trial in Denton, Denton County for the offense of capital murder, our petitioner contends that the district court in which it is set is without jurisdiction. The grand jury that returned the indictment was, and the trial court that proposes to try the case is, physically located in a structure within the City of Denton and in the County of Denton and named "Joseph A. Carroll Courts Building."[1] The petitioner asserts that the Carroll Courts Building, to which courts, county offices and other agencies formerly in the Denton County Courthouse were moved in 1978,[2] is not situated in the county seat of Denton County. Therefore, he contends, every act required by law to be performed at or in the county seat that has been and will be conducted in the Carroll Courts Building is null and void.

Against a backdrop of historical events and developments and applying the law to the operative facts as we find them to be, the application for extraordinary relief must be denied.

Previously called variously "municipalities," "precincts" and, finally, counties,[3] the Constitution of 1845 mandated the Legislature to "establish new counties for the convenience of the inhabitants of such new county or counties."[4] Then and until the Constitution of 1876, a new county was created by legislative act and its county

---

1. Hereinafter that structure will be referred to as "Carroll Courts Building." All emphasis is supplied throughout by the writer of this opinion unless otherwise indicated.

2. The minutes of the Commissioners Court of Denton County show that on April 6, 1978, by motion passed unanimously *viva voce*, the court declared "that the Joseph A. Carroll Courts Building, located at 401 Hickory St., Denton, Texas be designated as the official Courthouse and the seat for County Government effective April 10, 1978."

3. See Interpretive Commentary following Article IX, Section 1, Constitution of the State of

Texas, 2 Vernon's Texas Constitution 575ff. As there demonstrated, and concerning which one must be cautioned in examining the issues raised in this cause, the Constitution of 1876 rather drastically reformed the process for creating counties and for locating and removing county seats. See also Interpretive Commentary following Article IX, Section 2, *id.*. Every significant event fixing the county seat of Denton County occurred before 1876.

4. Article VII, Section 34, 3 Vernon's Texas Constitution 562.

seat was located by special action of the Legislature or by referendum authorized by the Legislature.[5] Thus, the genesis of Denton County is an April 11, 1846 legislative enactment, 2 Gammel's Laws of Texas 1363;[6] it also directed the manner of selecting alternative sites and an election to determine one to become the county seat,[7] and named it Pinckneyville.[8]

As a place for holding court, however, Pinckneyville was short-lived. Although near the center of Denton County, Pinckneyville soon was replaced as the "Seat of Justice," first by legislative act of February 24, 1848, 3 Gammel's 36, that authorized named commissioners to receive by donation or purchase not less than 40 acres of land sufficient for a county seat, to be known and called Alton where district and county courts should be held. That location turned out to be about three miles south of Pinckneyville. Then, some two years later, November 26, 1850, by an act "to perma-

nently locate" it, 3 Gammel's 834, the Legislature removed the Seat of Justice, effective February 1, 1851, to "the residence of Alexander E. Cannon, on Hickory Creek," and directed all courts, clerks and other officers required by law to keep office at the county seat to move them to the new location, giving *it* the name Alton. The next year, the Cannon residence perhaps becoming a bit crowded, the 1850 act was amended to locate the site, effective November 2, 1851, "on the donation of land" made by Cannon on Hickory Creek, 3 Gammel's 884.

As experience then and later generally demonstrated in the relatively new State of Texas, however, a county seat or a seat of justice, though initially declared to be permanent, often proved to be transient.[9] So it was to be in Denton County.

In 1875 the Denton County Courthouse and all its records of matters critical to the

5. Interpretive Commentary to Article IX, Section 2, supra.

6. The described thirty mile square area of the county was carved out of Fannin County and its inhabitants were granted all rights pertaining to the new county, except for purposes of legislative representation they were attached to Fannin County. In 1852, the boundaries of Denton County were somewhat altered by more precisely stated metes and bounds, 3 Gammel's 910.

The county and the city were named after John B. Denton, a pioneer lawyer, preacher and soldier who was killed in an 1841 Indian fight near Village Creek, just south of the county line in Tarrant County, in what was then Peter's Colony.

7. Named commissioners were directed to "find the centre [sic] of said county and select two places within three miles of said centre, having due respect to donations that may be offered by individuals of land and other property for a town site for the use of the county" and then to conduct an election, the place receiving a majority of "the legal votes" to be "the county seat of said county;" then the commissioners were charged "to layoff a town" and sell its lots at public auction; proceeds of the sales to be "applied . . . to the erection of public buildings for the use of the county."

8. In our record is an affidavit made in 1931 by three citizens, admitted as an ancient document, which recites that in 1846 the first County Seat of Denton County was located some

one and one half miles southeast of the "present Denton County Courthouse, and was called Pinkneyville [sic]" where, it was reported, a named district judge held court "under a clump of Oak trees."

9. Passing on issues arising out of an election to remove the county seat of Van Zandt County from Canton to Wills Point in *Ex parte Towles*, 48 Tex. 413 (1877) the court observed that the laws, with which we are concerned in this case, provided "a means of speculation and profit to some, and of loss to others, and have often been used for that purpose rather than for the public convenience," remarking further on a history of contested elections on the matter. History buffs will find a rich lore in the reported cases, e. g., *Baker v. Chisholm*, 3 Tex. 157 (1848): contest between Cameron and Clinton [sic] as "seat of justice" in DeWitt County; *Fowler v. Brown*, 5 Tex. 407 (1849): removal of the seat of justice of Leon County from "the house of Moses Campbell" to a place not disclosed in the opinion; *Arberry v. Beavers*, 6 Tex. 457 (1851): election of Jefferson over Linden for county seat of Cass County, and *Alley v. Denson*, 8 Tex. 297 (1852): removing by election the county seat from Jefferson back to Linden; *Walker v. Tarrant County*, 20 Tex. 16 (1856): an election to choose between Birdville and Fort Worth, the former having previously been selected as the county seat of Tarrant County; *McClelland v. Shelby County*, 32 Tex. 17 (1866): removal of county seat of Shelby County from Shelbyville to Canton.

issues in this cause burned. To show chain of title and for other purposes, there were prepared, executed and filed affidavits of early settlers, minutes of the Commissioners Court and attestations of a lawyer cum land agent—by a romantic coincidence, the same Joseph A. Carroll after whom is named the Carroll Courts Building in question here. It is from these papers and other historical materials admitted in evidence below and in the record before us that the following account is drawn.[10]

In 1856 there was in Denton County what is denominated variously in the papers a "town" or "city"—but, for valid reasons that shall later appear, we choose to call it a territory or community—known as Denton.[11] Beyond any doubt, an election was held on the first Tuesday of November 1856, in which, according to locally recounted folklore, 136 votes were cast. Pertaining to removal of the county seat or seat of justice from Alton, the actual question presented to the voters was lost to the 1875 flaming of the courthouse and in antiquity.[12] Unlike statutes since the 1876 Constitution which specifically prescribed that the ballot in such a removal election express the choice of the voter by "the name of the place," e. g., Article 1598, V.A.C.S., the law in effect during the time of the 1856 removal election in Denton County was not that specific.[13] While, as already seen from the cases treated *ante* in note 9, often the ballot did name the competing places, that feature was not a legally prescribed prerequisite—indeed, even after 1876 in *Whitaker v. Dillard*, 81 Tex. 359, 16 S.W. 1084 (1891), the court approved a ballot that queried removing the county seat to nothing more particularly stated than "the geographical center" of the county,[14] and consequently held

10. Keeping in mind the important interests then at stake and purposes for which the now ancient documents were prepared and, with deference, the excusable tendency of local chroniclers to accept as fact that which is really legend, we guardedly approach them to ascertain and state their meaning.

11. Thus an order of the Commissioners Court to quiet title to property entered October 1, 1932 refers to "City of Denton;" a June 10, 1889 affidavit of Carroll calls it the "town of Denton," as does a May 14, 1920 affidavit prepared for and executed by C. A. Williams, formerly a sheriff of Denton County; an affidavit executed by one John Bacon, a fifty year resident in 1923, speaks of removing the county site "from Alton to Denton;" one historian mentions "tiny Denton."

Finally, the trial court, based on materials presented, judicially noticed that in 1857 "the City of Denton was founded;" but, as we shall develop, if that fact is meant to be "incorporated" the court was misled on two counts: the community was not then a City nor was it an incorporated Town.

12. The Commissioners Court order, note 11, supra, recites that the purpose of the election was to determine "whether said County site [sic] should be so removed from Alton, to the present site of the said City of Denton." In the Bridges' and McCormick's works the election was "for the purpose of relocating the county seat nearer the center of the county" on a hundred acre tract of land, made up of three parcels "covenanted" to be donated, respectively, by the owner of each; Land Agent Carroll swore the election decided "to remove the County Site from Alton to said town of Denton;" former Sheriff Williams affirmed that it moved the County site "from Alton to said town of Denton same being located on the lands hereinabove indicated," that is, the 100 acre tract. In its brief the State flatly says that the county seat was "lawfully moved from Alton to the city of Denton." Only Bridges alludes to a competing location: "Ezekiel Boone, who had only recently come to Denton County in 1855, offered to donate 40 acres of land on the brakes of Hickory Creek some three or four miles up the creek northwest from New Alton."

13. The law still operative was the Act of May 8, 1838 of the Republic of Texas, *Fowler v. Brown, Alley v. Denson*, both supra at note 9, and see *Ex parte Towles*, 48 Tex. 413 at 425. Reported as Articles 337 and 338, Hartley's Digest, the Act was substantially carried forward as Articles 279, 280 by Oldham & White in their authorized Digest, at 85. It simply provided that upon proper initiative the Chief Justice of the County affected may order an election "for a removal of the seat of justice" and "the result of said election shall establish the seat of justice."

14. The geographical center turned out to be Boston, but five years later the election see-saw favored Texarkana, *Behan v. Ghio*, 75 Tex. 87, 12 S.W. 996 (1889). Meanwhile, a legislative undertaking to establish a civil and criminal court in Texarkana failed, *Whitner v. Belknap*, 89 Tex. 273, 34 S.W. 594 (1896); subsequently, after the county seat was returned to Boston, a similar effort was also spilled in *Turner v. Tucker*, 113 Tex. 434, 258 S.W. 149 (1924). But

that the description did not render the election invalid.

Of course, our concern here is not the legality of the 1856 election in Denton County but with ascertaining the intention of the citizens who voted in the election. *Ralls v. Parrish*, 105 Tex. 253, 147 S.W. 564, 566 (1912). Since we cannot know from our record what language appeared on the ballot submitting the question, in search of the answer we turn to the factual setting of the election, its consequences. and subsequent events that may provide it.

Petitioner abundantly demonstrated in the trial court and the State appears to accept that the motivation for the 1856 election was, as the Commissioners Court put it in its order quieting titles, "a desire upon the part of certain of the citizens of said [Denton] County that the County site be removed from Alton and that it be located nearer the center of said county." Together three landowners, each holding title to all or a substantial part of three respective surveys in their own name or another's containing from some 100 acres in one to 320 acres in the largest, executed and entered into a bond and obligation that if the county site or seat were removed from Alton one would donate 20 acres and the other two 40 acres each, aggregating 100 acres of land. The parcels thus tendered joined in such a way that, as petitioner correctly describes it, the resultant tract shown on drawings in the record resembles the outline of the State of Utah.[15] Whether the drawing of the entire surveys and the 100 acre tract by the hand of Carroll, or a similar one, was extant at the time of the 1856 election is not revealed in the record; cf. *Ralls v. Parrish*, supra, 147 S.W. at 566 with *Whitaker v. Dillard*, supra, 16 S.W. at 1086. Nor is Boone's offer documented.

After the voters authorized removal of the county seat from Alton the Commissioners Court of Denton County employed the same J. A. Carroll to subdivide the whole 100 acre tract into blocks, lots, streets and alleys. He did that, according to the Commissioners Court minutes, during 1858; from the recollection of Sheriff Williams by January 1857.[16] The entire tract of 100 acres was subdivided into 33 blocks and apparently all but one block into lots—that one became the "public square"—and, as recounted by the 1932 order of the Commissioners Court, the plat of the whole tract as thus divided "was designated upon the plat and record thereof at [sic, probably "as"] the original plat of the City of Denton."[17]

now see Article 199(5), V.A.C.S. and Historical Note following.

15. Each 40 acre parcel together make an almost perfect square; the twenty acre parcel sits on the square with its western boundary making an extension of the north-south line of the western boundary of the square, thus creating a "panhandle." In surveyor's terminology, the entire western line measures 40.01 chains, the top of the panhandle is 15 chains, its eastern boundary is 13.33 chains, the balance of the northern boundary of the square is 14.14 chains, its eastern side is 28.28 chains, the base of tract is 29.14 chains.

The 20 acre parcel that is the panhandle was "covenanted" by R. W. Woodruff who died before executing a deed conveying it to Denton County; the 40 acre parcels were donated by Wm. Loving and wife, Sarah, and by Hiram Cisco and wife, Elizabeth, respectively, and conveyed through deeds executed in 1858.

16. A photograph of what is said to be the original "lay-off" done by Carroll is not dated nor is one attributed to it by any other source. One of the historians reports that the first sale of lots occurred January 10, 1857, a date that coincides with that in the affidavit of Sheriff Williams who, with pardonable pride, identifies himself as the one who made the sales through auction on that date. Nevertheless all title-quieting materials, including the Williams deposition, consistently state that two of the "covenanting" grantors did not execute their deeds of conveyance until February 24, 1858 and the administratrix of the third grantor, he having died in the interim, not until August 26, 1858. We doubt that its lots were actually sold before title was in the county; indeed the Commissioners Court order relates that not until *after* receipt of the last conveyance was Carroll employed "to plat and subdivide" the 100 acre tract. In any event, there is no evidence that a plat identifying the 100 acre tract was made prior to the 1856 election.

17. In his book "History and Reminiscences of Denton County" copyrighted in 1918, Bates seems to have found otherwise or, perhaps, is only criticizing implementation of Carroll's concept, for he writes: "The *city* had 100 acres of land deeded to it and had a splendid oppor-

Still, we gather that initially the blocks and lots developed with improvements and occupied by the early denizens of the laid out community were those about and near the public square—all in the "panhandle" area.[18]

Notwithstanding sales of its lots, Denton County must have experienced financial difficulty for in February 1860 it was one of several counties authorized by the Legislature "to levy and collect an additional special tax, not more than the State tax, for the purpose of erecting county buildings," 5 Gammel's 221. Six years thereafter, presumably because proceeds from the special tax were disappointing,[19] the Legislature empowered the "Police Court" of Denton County[20] to issue bonds in the name of the county "in any amount not to exceed ten thousand dollars, for the purpose of erecting the necessary public buildings for the use of said county," 5 Gammel's 931.

Passed by the Legislature January 27, 1858, was an act providing for incorporation of towns and cities, 4 Gammel's 941 *et seq.*, by the terms of which 300 villagers were required to upgrade to a Town and, to become a City, a village or town needed at least 1500 inhabitants. By an act approved September 26, 1866, 5 Gammel's 1272,[21] "the citizens of the town of Denton, in Denton County" were "hereby declared to a body politic and corporate, under the name and style of the Corporation of the town of Denton . . .," and as such its organization and election of specified officers were directed. Section 6 provides:

"Sec. 6. That the limits of said Corporation shall extend one half mile in every direction from the centre [sic] of the public square, in said town of Denton."[22]

November 12, 1866 the Legislature made applicable to the town of Denton the provisions of the Act of January 27, 1858, providing generally for incorporation of towns and cities, 5 Gammel's 1129.

 Having related what are considered to be the historical events and oc-

---

tunity to lay off the city in blocks and lots in regular order, but for some reason did not do so."

Again, as shall be shown *post*, designating the community during that period "City of Denton," as the Commissioners did in their order, or calling it a "city" as Bates and others did, if intended to suggest that it was something other than unincorporated territory, is erroneous.

18. There is a plat in the record so indicating and Bates recounts that "records were moved into the new Courthouse in April 1857" which, according to another source, was located on the north side of the public square. Nevertheless, Sheriff Williams recalled that at the auction held by him he sold off "practically all of the lots and blocks donated to Denton County for townsite purposes." For its part the Commissioners also found the auction was a success, but that it was not held by Williams until 1858.

19. Texans were, it is to be recalled, then going through the period of "the late unpleasantness," soon to be followed by "reconstruction."

20. A Police Court was a creature of the 1866 convention presided over by Governor J. W. Throckmorton that produced the Constitution of 1866, 3 Vernon's Texas Constitution 628. Article IV, Section 17, provided in pertinent part that the four county commissioners to-gether with the Judge of the County Court "shall constitute, and be styled, the Police Court for the County" charged with "regulating, promoting, and protecting the public interest relating to the county." In the 1876 Constitution it was transformed into Commissioners Court.

21. A matter not called to our attention by either party that may be of critical significance in our determination of this cause.

22. One half a mile is 2,640 feet. Plats in evidence reflect the location of the public square and measure by chains translated into feet the boundaries of the panhandle as well as the distance from the western boundary to the Carroll Courts Building. With these formulations we are able to calculate the number of feet from an extended center line of the public square to the Carroll Courts Building, and from that we have ascertained that radially the Carroll Courts Building is right at 1,100 feet from the center of the square. Thus, the Carroll Courts Building is within the corporate limit of the Town of Denton established at the time of its incorporation.

By its act of May 28, 1873, 7 Gammel's 1316, the Legislature redefined the boundary of Denton into a two mile square around the center of the public square.

currences that bear on it,[23] the core question recurs: What are the geographical limits of location of the county seat of Denton County after it was removed from Alton pursuant to the November 1856 election? Claiming to have the answer, petitioner assumes a heavy burden of persuading the Court in this extraordinary proceeding he has initiated that his is the only one and that it is correct.[24] The line between writs of mandamus and prohibition is often thin, e. g., *State ex rel. Vance v. Clawson*, 465 S.W.2d 164, 168–169 (Tex.Cr.App.1971), but entitlement to either must be shown to be "clear and indisputable," *Will v. United States*, 389 U.S. 90, 96, 88 S.Ct. 269, 274, 19 L.Ed.2d 305 (1967); *Denison v. Sheppard*, 122 Tex. 445, 60 S.W.2d 1031 (1933); "unequivocal," *Wortham v. Walker*, 133 Tex. 255, 128 S.W.2d 1138, 1151 (1939); "abundantly clear," *Meissner v. Fuchs*, 290 S.W.2d 941, 944 (Tex.Civ.App.—Galveston 1956) error dismissed. In our judgment petitioner has not sustained his burden, for the writ will not issue "if the right is doubtful" nor "if there is any substantial defect in the proof of the . . . right," *English v. Treaccar*, 153 S.W. 539, 541 (Tex.Civ.App.—Galveston 1941). We agree that the writ "issues to require the execution of a matter whose merit is beyond dispute, and may not be employed as scales in which to balance the weight of evidence or to bridge the gap between broken and disconnected facts," *Wortham v. Walker*, supra, 128 S.W.2d at 1151.

The wide-open gap that the proof in our record does not close is the language of the question put to and the answer given by the 136 voters in that removal election on the first Tuesday of November 1856. Petitioner would have it that the electorate designated the place voted for substantially as "a 100 acre tract of land, three-quarters of a mile from the geographical center of Denton County," whereas the State says they opted for "the city of Denton." We do not know from this record that the voters did either and, from an impartial view in light of contemporaneous law and circumstances, they may have done neither.

In such matters the general proposition of law as to initial location, 20 C.J.S. "Counties" § 55 Site, p. 810, and subsequent removal, *id.*, § 70c(2), at 823, Ballots and Form of Submission is:

". . . In the selection of a county seat the choice is not limited to existing cities or towns, but a site may be chosen for a new town and the county seat located therein. Neither is it necessary that the place selected should be platted, or have fixed and definite boundaries, and a selection . . . is good and operative if it designates a place which is well known, and which is the only place in the county."

and "the question of removal must be so submitted that the voter shall be left free to vote for any place in the county." Accord: *Whitaker v. Dillard*, supra, 16 S.W. at 1086:

". . . We do not understand that the statute requires a petition for an election to remove a county-seat, nor an order directing an election for that purpose, to state what point it is desired to remove a county-seat, nor that, when an election for such purpose is ordered, the people may not vote to place the county-seat at any place that may suit them . . . Neither . . . can restrict the right of qualified voters to vote for as many places as they please. . . . It does become important, however, that the voters so designate the place voted for that it may be identified, and thus the actual locality of the place selected for county-seat be determined."

---

**23.** Like the court in *Wortham v. Walker*, infra 128 S.W.2d at 1150, "We cannot disengage this controversy from the historic framework in which the facts are disclosed."

**24.** We assume *arguendo*, but do not undertake to decide, that petitioner has all necessary attributes of "standing" to make what the State characterizes as a collateral attack on the 1978

"judgment" of the Commissioners Court by which certain declarations already alluded to *ante* in note 2 were made. For purposes of this opinion, however, we find it unnecessary to address the rather serious, certainly complex, questions as to its power and authority to make them and the procedure by which they were done.

We have some evidence that before the election there was a territory or community of inhabitants in homes and on farms in, around and near "tiny Denton" that later grew on and about the 1857–1858 platted townsite, and the affidavits of Carroll and Williams respectively refer to "the town of Denton" and "the said town of Denton *being* located on the lands" indicated. Thus, for aught that appears the ballot may well have presented one of the options as, or the voters wrote in, "Denton" or some similar designation of the place,[25] particularly since the proof here shows beyond any doubt that deeds were not executed until 1858 and the townsite was not platted and laid out until after the 1856 election, most likely in 1857–1858.

Accordingly, although one may surmise that the voters were aware of the "cove-

nanted" 100 acre tract, this Court is not compelled to find that they designated it as the new county seat. *Ralls v. Parrish*, 151 S.W. 1089, 1092[26] (Tex.Civ.App.—Amarillo 1912) no writ history.

The point is critical, given the law fixing boundaries of an unincorporated community, village or town. As concluded in *Ralls v. Parrish*, 147 S.W. 564 at 566:

". . . Where a town is duly incorporated, it is embraced within definite metes and bounds and without respect to an aggregation of inhabited houses, but, where it is an unincorporated town, its area is defined to be and to embrace the aggregation of inhabitants and the collection of occupied dwellings and other buildings constituting such town."

Accord: *Pitts v. Camp County*, 120 Tex. 558, 39 S.W.2d 608, 616[27] (Comm.App.,

---

**25.** First, as the Commissioners Court found, "there was a desire upon the part of certain of the citizens of said County that the County site . . . be located nearer the center of said County." That a petition, order and ballot designating one choice as "the geographical center" would have been legal is the lesson of *Whitaker v. Dillard*, supra.

Second, the voters might have been queried in terms that related to the house or residence of one of those inhabitants, just as the Legislature itself had provided in 1851 when it moved the seat of justice to the Cannon place, and provided that the site be named Denton.

Similarly, and third, the ballot could have identified the location in reference to lands to be donated by Messrs. Cisco, Loving and Woodruff, much as the Legislature did in amending its own designation of the seat of justice to read "on the donation of land made by" Cannon on Hickory Creek. But even that identification would not have necessarily described boundaries of the lands to be donated by them. That the Commissioners Court order in 1932 recited that the "covenant" did describe the three parcels by metes and bounds does not require us to find that the voters knew of and cast a sufficient number of votes for these descriptions rather than, say, "Denton."

We are well aware that the position of petitioner in this Court remains as it was stated to the trial court: That the 1856 election was to move the county seat to "a certain acreage and certain set of tracts described by metes and bounds" rather than to the "city of Denton" since it did not then exist because "there was nothing here but prairie and whatever streams and rivers there were." His authority for that

position, and so far as we can ascertain his only authority, is one sentence in Bridges, "History of Denton County from its Beginning to 1960," at 68, *viz*: "There was no settlement there then, although there were a few homes and neighboring farms widely scattered around near the town site." Yet, although in the public domain, from its title Bridges did not publish his book until after 1960 and, like the obituary notice in *Sherrill v. Estate of Plumley*, 514 S.W.2d 286, 290–291 (Tex.Civ.App.—Houston (1st) 1974) writ refused n. r. e., we cannot say that Bridges wrote the statement from personal knowledge. Whatever Bridges meant by "settlement," he still shows that the area was populated, albeit sparsely. The panhandle area was, after all, only 990 feet across.

**26.** "The record in this case is silent as to any intention on the part of the voters to vote for a town plat as the county seat in 1891. Such intention could be established only by inference. The trial court, from the evidence before him, drew the inference that the voters at the time intended to vote for the town of Emma as then known at a place . . . and that the county seat was then located at that point. On the evidence before that court we cannot say the trial judge erred in such conclusion . . ."

**27.** "So we conclude that by the phrase 'county seat' as used in this instrument, is meant the territory which comprised at the time the town of Pittsburg, which town, being then unincorporated, meant the inhabited territory, and not any particular part of said territory."

Opinion Answering Certified Questions Adopted, 1931).

For all that we can learn from the record before us, in November 1856 as unincorporated territory Denton may have embraced within its outer limits the panhandle area of the 100 acre tract, the whole of the tract and lands outside either or both.[28] The *later* prepared and filed plat of the original town site of Denton is not, *ipso facto*, the county seat removed to Denton. Such is the holding in a similar fact situation of *Ralls v. Parrish*, supra, 147 S.W. at 567:

". . . The original town plat of Emma as it existed at the time it became the county seat of Crosby County in 1891 did not constitute the county seat, but rather the collection of inhabited houses, and the area appurtenant to such houses constituted the town and therefore the county seat. The town of Emma as the voters knew it and as they intended it should constitute the county seat should control."

Indeed, if Bates[29] correctly discerned that "records were moved into the new Courthouse in April 1857"—more than a year ahead of execution of the deeds to the panhandle parcel and well before Carroll platted and subdivided the town site around a public square—it would seem to follow that the community of Denton actually became the county seat, the seat of justice, in advance of Carroll's laying off the original town site.

In law "county seat" is that town or city where the seat of the county government is located, where the courthouse is, where the courts are held and the county officers perform their functions. *Turner v. Tucker*, 113 Tex. 434, 258 S.W. 149, 151 (1924); *Pitts v. Camp County*, supra, 39 S.W.2d at 616; *Ralls v. Parrish*, 149 S.W. 810, 812 (Tex.Civ.App.—Amarillo 1912) on rehearing, 151 S.W. 1089 (Tex.Civ.App.—Amarillo 1912) no writ history; 20 C.J.S. "Counties" § 53. Thus, if the courthouse were standing and open for business in a community, village or town known as Denton before the townsite was platted and laid off, it and its environs was the county seat, not the platted townsite.

Yet, like the Supreme Court in *Ralls v. Parrish*, supra, 147 S.W. at 567, this Court is not in a position to "determine the issue of fact as to what constitutes the boundaries" of Denton, as county seat. We are constrained to observe that, when it came to exercising its conceded power and authority to transform Denton into an incorporated town, the Legislature first set the boundaries of the Town of Denton according to a formulation that creates a perimeter around a smaller area of much different shape than the metes and bounds of the original platted townsite,[30] and then some seven years later enlarged it to a two mile square.[31] However, as pointed out *ante* in note 11, these particular developments were not noticed by the parties and, accordingly, have not been briefed or discussed by either. It is mentioned as a matter that may bear on the issue before us,[32] but is not addressed by petitioner in seeking to show

---

**28.** "A town may exist without being divided into lots; and, on the other hand, neither naked lots, whether with or without a map, constitute a town. If the population extended beyond the platted portion of the town, such extension was properly embraced with the limits of the incorporation." *State v. Town of Baird*, 79 Tex. 64, 15 S.W. 98 (1890).

**29.** Bates, "History and Reminiscences of Denton County," 263.

**30.** Act September 26, 1866, 5 Gammel's 1272.

**31.** Act May 28, 1873, 7 Gammel's 1316.

**32.** It occurs to us that a legislature possessed of plenary power to remove county seats as it is advised, *Walker v. Tarrant County*, supra,

that it exercised from time to time, e. g., *Allen v. Denson*, supra, had the authority to draw the boundary of a town that it knew, or was charged with knowing, had previously been designated the county seat—either with undefined boundaries or with boundaries indicated on an original townsite plat. Rather than decide the point, being without briefs treating it, we merely note it in passing, along with the historically documented fact that the practice of legislative locating and changing county seats was so distasteful to Framers of Constitution of 1876 that they expressly prohibited it in Article III, Section 56. See *Turner v. Tucker*, supra, 258 S.W. at 151.

his "clear right" to relief. In any event, other than the legislative drawing of limits the record is barren as to boundaries of the unincorporated territory, community, village or town of Denton in 1856.

▮ As in *Wortham v. Walker*, supra, 128 S.W.2d at 1151, because the writ may not be utilized "as scales in which to balance the weight of evidence or to bridge the gap between broken or disconnected facts," this Court, like others in this State, "is without power to convert a writ of mandamus [or prohibition] into an adjudication of a doubtful claim." Being unable to find from the record before us a factual foundation so free from doubt that establishes his clear legal right to the extraordinary relief sought by petitioner, the Court must refuse it.

The application for writs of mandamus and prohibition is denied.[33]

DOUGLAS, Judge, concurring.

I concur with the majority that relief should not be granted.

This is a collateral attack upon an indictment alleging that the courthouse of Denton County is not located at the county seat. This Court has held that a collateral attack may not be made upon an indictment where it was presented at the *de facto* site of county government:

"The jurisdiction of the court to try this case at Marfa did not depend upon the question whether or not Marfa was the county-site *de jure* of Presidio county. It being *de facto* the county-site was sufficient to give the court jurisdiction; *Marfa* was being occupied and recognized as the county-site under color of authority of law,—under color of its having been selected and established as such county-site in the mode provided by law. The plea sought to inquire into and determine whether it was the county-site *de jure*.

This question could not be raised collaterally. If Marfa was not rightfully and legally the county-site, being such *de facto* its legality as a county-site could only be inquired into and determined by some direct proceeding had for that purpose. Such direct proceeding has been taken, and our supreme court, since this conviction was had, in such proceeding decided that *Fort Davis* and not *Marfa* was the county-site *de jure* of Presidio county. *Caruthers v. State*, 67 Tex. 132, 2 S.W. 91. But, as before stated, Marfa, at the time the trial and conviction in this case were had, was the county-site *de facto*, and, being so, it matters not in this case that it was not the county-site *de jure*. This question is analogous to a collateral attack made upon the authority of an officer *de facto*. The authority of a *de facto* officer cannot be questioned collaterally. His official acts, until ejected from office, are valid. *Aulanier v. The Governor*, 1 Tex. 653; *McKinney v. O'Connor*, 26 Tex. 5; *Ex parte Call*, 2 Tex.App. 497. We are of the opinion that the trial of the case at Marfa was legal and valid, notwithstanding said town was not the legal county-site of Presidio county at the time." *Watts v. State*, 3 S.W. 769, 770 (1886), 22 Tex.App. 572.

We should now follow *Watts* and dismiss the application for prohibition and mandamus because leave to file was improvidently granted.

▮

**33.** Since we are advised that petitioner has perfected appeals from denial of habeas corpus relief on grounds that the grand jury which indicted him was discriminatorily constituted, motion for leave to file the application in the instant cause insofar as it challenges composition of the grand jury in its point four, was improvidently granted. See *Bradley v. Miller*, 458 S.W.2d 673, 675 (Tex.Cr.App.1970); cf. *Ex parte Becker*, 459 S.W.2d 442 (Tex.Cr.App. 1970).