William Louis WHITE

v.

**Putnam Kaye REITER, Judge, 87th Judicial District Court of Freestone County.**

No. 68977.

Court of Criminal Appeals of Texas, En Banc.

July 21, 1982.
Opinion Filed Oct. 20, 1982.

Charles McDonald and Merrilee L. Harmon, Waco, for White.

Robert W. Gage, County Atty., Fairfield, for Sessions.

Putnam Kaye Reiter, Mexia, pro se.

Robert Huttash, State's Atty., Austin, for the State.

## OPINION

CLINTON, Judge.

This cause seeks to invoke the original subject matter jurisdiction of the Court provided by Tex.Const. Article V, § 5,[1] and is denominated an original application for both writ of habeas corpus and writ of prohibition by the Petitioner. A detailed chronology of events to which we may refer throughout, is essential to an understanding of the issues presented.

On or about December 12, 1981, two Texas Department of Corrections (T.D.C.) inmates escaped from the Coffield Unit located in Anderson County and crossed the Trinity River into Freestone County. They allegedly entered several weekend homes along the river, taking food and clothing, then appropriated a dump truck for transportation. These inmates, one of whom was Richard P. Stone, were apprehended a short time later at a roadblock set up by T.D.C. employees, and returned to the Coffield Unit. Richard Stone was thereafter indicted by a Freestone County grand jury for the offenses of burglary of a habitation and unauthorized use of a vehicle.

The record indicates that after these indictments were returned, T.D.C. authorities were reluctant to release Stone to Freestone County, preferring instead to keep him in custody at the Coffield Unit and have T.D.C. security personnel escort him to and from Freestone County for court appearances.[2]

It was apparently on February 1, 1982, that the Honorable P. K. Reiter, Judge of the 87th Judicial District Court of Freestone County (Respondent), contacted W. J. Estelle, Director of the Texas Department of Corrections, by telephone, and informed him of the necessity to appoint counsel for Stone and his coindictee who were indigents incarcerated in T.D.C. Respondent advised Estelle that in view of the custodial circum-

1. "Subject to such regulations as may be prescribed by law, the Court of Criminal Appeals and the Judges thereof shall have the power to issue the writ of habeas corpus, and, in criminal law matters, the writs of mandamus, procedendo, prohibition, certiorari * * * and other such writs as may be necessary to protect its jurisdiction or enforce its judgments."

Article V, § 5, supra. Article 4.04, V.A.C.C.P., prescribes that power and authority in similar terms.

2. The record also indicates that this reluctance was shared by Freestone County officials since, as the county attorney conceded, T.D.C. would not have the option to dishonor a court ordered bench warrant for Stone should one issue. Apparently none did.

stances of the accused, he was considering appointing Staff Counsel for Inmates (staff counsel).[3] Estelle advised Respondent that "whoever the court appointed was fine with [him];" he confirmed that the staff counsel do not represent T.D.C. or T.D.C. employees and agreed that he could see no conflict of interest in staff counsel attorneys accepting such an appointment; he further confirmed that he would anticipate no hardship "since these lawyers frequently travel to the various [T.D.C.] units in performance of their duties." Estelle agreed to have the Director of the Staff Counsel, William Louis White (Petitioner), contact Respondent by telephone.[4]

On the same day, February 1, 1982, Respondent entered an order appointing Petitioner to represent Stone in both causes.

Thereafter, on February 5, Petitioner did contact Respondent and advised him that pursuant to Estelle's instruction, he was providing the court with names of two staff counsel attorneys, including his own. Though the evidence conflicts somewhat, it appears that Petitioner informed Judge Reiter that he was simply following instructions by furnishing the names, and that if the court did appoint him, he later might "disagree or express [his] opposition to the appointment."[5] Thereafter, Petitioner received by mail the written order appointing him to represent inmate Stone which Respondent had already entered on February 1.

It somehow came to the attention of Respondent in early March that Petitioner objected to his appointment. Respondent suggested that a motion to withdraw be filed by Petitioner, and requested the Honorable Tate McCain, also a Judge of the 87th Judicial District, to hear the motion. Petitioner did file a motion to withdraw which essentially alleged the following: (1) that due to the circumstances of Stone's arrest after his escape, other T.D.C. employees would be called to testify to establish the validity of that arrest, placing Petitioner in conflict with interests of either his fellow employees (and perforce, his employer), or his client, Richard Stone; (2) that the investigation and trial of the case would work a hardship on Petitioner because the situs of the trial is approximately 86 miles from Huntsville, his residence, and the Coffield Unit is approximately 100 miles from Huntsville; (3) that representation of Stone would take Petitioner away from his full time duties as Director of the Staff Counsel and the staff was at that time "short of attorneys;" and (4) that Petitioner would be required to take earned vacation time from his State employment for all time spent representing Stone because T.D.C. funds would not be available for such activity.

On March 8, 1982, a hearing was convened upon this motion before Judge McCain. Petitioner stated into the record, "it's my firm belief that any conviction [of Richard Stone], if I am forced to proceed, would be reversed by the Court of Criminal Appeals because of [the] conflict [of interest]." The county attorney elicited from Petitioner that the latter engaged in a limited private practice in addition to his full time State employment; that Petitioner does not represent T.D.C. employees; that Petitioner understood that Stone was not

---

3. From testimony we glean that these attorneys employed by T.D.C. as staff counsel are authorized to handle any legal matter for indigent inmates of T.D.C. *other than* those in which the legal interests of the indigent inmate are adverse to T.D.C. or T.D.C. employees acting within the scope of their employment.

Though frequent reference was made to an "agreement" extant between T.D.C. and the staff counsel which presumably specifies the sanctioned scope of the staff's state employment, no one caused it to be included in the record before us.

4. While Mr. Estelle's courteous deference to Judge Reiter's reasoning in this conversation suggests some discomfort at being consulted, other evidence in the record also indicates his unwillingness to influence in any way a decision he correctly perceived to be within the sole province of the judiciary and thus necessarily outside his own.

5. According to his brief filed in this Court, Respondent was under the impression that Petitioner had accepted the appointment during this communication.

charged with any "offense against the Texas Department of Corrections" and, finally, "that the Court has appointed you in your *individual capacity*[6] and not as a staff counsel ... for inmates with the Texas Department of Corrections." Judge McCain overruled Petitioner's motion to withdraw and set an April 5, 1982 trial date for Stone; then the following transpired:

> "[PETITIONER]: Your Honor, respectfully I decline the appointment and feel that it is contrary to the law of the State that I ... continue with the appointment and would refuse to accept it.
>
> THE COURT: Well, it is with equal amount of respect, sir, that I regret that you have refused to follow the dictates of this Court and I consider your refusal to do so as an act of contempt and in punishment therefor [assess 30 days confinement in the Freestone County jail]."

Petitioner was ordered jailed but then released on his personal bond pending a second hearing.[7] Judge McCain's order and commitment were reduced to writing on the same day. On March 16, Judge McCain entered another order, setting a contempt hearing before another appointed district judge, for April 1, 1982.

On April 1, the Honorable David Walker of the 159th Judicial District, pursuant to appointment, convened a second hearing. At this hearing Petitioner elaborated upon his view of the conflict of interest he anticipated in the event he were to represent Stone. Due to the nature of the offenses charged, Petitioner was of the opinion that it would be incumbent on the State to prove "the whole criminal transaction, ... circumstances of [Stone's] escape [from T.D.C.] would have to be proved up." Also, it was Petitioner's understanding "that [Stone's] arrest involved employees of the Texas Department of Corrections. * * * That there was a roadblock set up by the Texas Department of Corrections and ... [Stone was] arrested at that time as a result of the roadblock." Petitioner opined that the validity of that roadblock would be litigated in Stone's defense because it was his understanding that T.D.C. "has no authority under state law" to stop a vehicle on a public road. Therefore, Petitioner would be placed in the position of either having to attempt to show that fellow T.D.C. employees were acting illegally and possibly not testifying truthfully, or failing to provide Stone with the vigorous representation to which he was entitled.

Petitioner testified that he was not necessarily concerned that he might lose his State job, but explained that, due to the nature of the staff counsel's objectives, the relationship between the inmate attorneys and other T.D.C. employees was at times a tenuous one to which the staff was always attentive since the success of many pursuits on behalf of inmates was dependent on the cooperation of these fellow employees, the "keepers" of his clients. It was Petitioner's "fear that [his] zealous defense of [his] client might conflict with the longer range purposes that [he had] as director of staff counsel."

Petitioner stated that he did not think a lawyer placed in his position could feel assured in his own mind that he could represent Stone without an attitude of divided loyalty; therefore, it was his professional opinion that postconviction relief would be

---

**6.** The assertion that Mr. White was being appointed in his "individual capacity" as opposed to official capacity as a staff counsel attorney was made repeatedly throughout the record before us. But see n.20, *post.* (All emphasis is mine unless otherwise indicated.)

**7.** Article 1911a, V.A.T.S. provides in pertinent part:

> "Sec. 2(a) Every court other than a justice court or municipal court may punish by a fine of not more than $500, or by confinement in the county jail of not more than six months, or both, any person guilty of contempt of the court.
>
>    *    *    *    *    *    *
>
>   (c) Provided, however, an officer of a court held in contempt by a trial court, shall upon proper motion filed in the offended court, be released upon his own personal recognizance pending a determination of his guilt or innocence by a judge of a district court, other than the offended court. Said judge to be appointed by the presiding judge of the Administrative Judicial District wherein the alleged contempt occurred."

granted Stone either in State or Federal court in the event a conviction were obtained and upheld on appeal, even if Stone entered a plea of guilty. Petitioner testified he had never before refused an appointment in his 22 year legal career.

There was also testimony regarding the unavailability of staff counsel funds for Stone's representation under the circumstances and the collateral hardship such representation would cause Petitioner.[8] The county attorney adduced evidence that Petitioner had made appearances in the 87th Judicial District Court on an unrelated matter in his capacity as a staff counsel attorney in February of 1982.

The county attorney, Robert Gage, testified it was his understanding from conversations with him, that Judge Reiter had appointed petitioner to represent Stone because Petitioner "would have ready access" to Stone at the Coffield Unit. Gage also testified there were about four attorneys in Freestone County who were competent to handle criminal cases, and there existed no "unusual situation or crisis" in the county preventing those attorneys from being appointed.

At the conclusion of the hearing Judge Walker orally announced there was no showing Judge McCain's prior order of contempt was in error, and reduced Petitioner's punishment to five days in jail and a $300.00 fine. Further, Petitioner was ordered to purge himself of contempt by agreeing to represent Stone in writing or open court, within ten days from that date. Petitioner's existing bond was continued in the event it was his desire to pursue further remedies in this Court. On the same day, April 1, Judge Walker's order was reduced to a written Judgment of Contempt in which its enforcement was stayed for ten days in order to allow Petitioner time to either agree to represent Stone and thereby purge himself of contempt, or file an original habeas corpus action in this Court. Under the written judgment, if Petitioner choose to seek relief in this Court, enforcement was ordered stayed until ten days after this Court "finally disposed of this cause." Salient portions of the Judgment of Contempt are reproduced in the margin.[9]

On April 12, 1982, a Monday, Petitioner timely presented [10] an original application for writ of habeas corpus and motion for stay in this Court. On the morning of April 15, this Court denied Petitioner leave to file without written order.

Since a pretrial hearing in the causes entitled *State v. Stone* had been set for April 15, Petitioner appeared before Respondent that afternoon and, according to the parties' briefs, he at that time presented additional evidence on and reurged his motion to withdraw.[11] The record indicates

8. Judge Walker questioned Petitioner at some length about other cases in which it was known that attorneys had represented indigents on a court appointed basis in counties other than their counties of residence and practice. Petitioner agreed that this practice was not unusual, but he had never known of an instance *in which such an appointment was made over the attorney's objection*, and in fact in most cases he knew of, the appointment was made at the attorney's request.

9. "... [T]he undersigned judge ... finds that William L. White is in direct contempt of this Court for refusing to accept a lawful appointment as counsel for the indigent Richard P. Stone and hereby assesses his punishment at confinement in the Freestone County Jail for a term of five days and thereafter until a fine of $300.00 is paid or until such time as the *said William L. White has purged himself of* contempt by agreeing either in open Court or in writing and filed with the Clerk of this Court within 10 days from this date that he will accept the appointment as attorney for Richard P. Stone.

The enforcement of this judgment is hereby stayed for 10 days, or until April 11, 1982. Further if within 10 days, or by April 11, 1982 William L. White files in the Texas Court of Criminal Appeals in Austin, Texas, an original habeas corpus application contesting this Order, enforcement shall be stayed until 10 days after the Court of Criminal Appeals has finally disposed of this cause."

10. Since April 11 was a Sunday, Petitioner's application was timely presented on April 12. Tex.Cr.App. Rule 7.

11. Up to this point, Petitioner had been ably represented by Assistant Attorney General Douglas Becker. After this Court denied his application without written order on April 15,

that at this time County Attorney Robert Gage advised Respondent in open court that there was a conflict, or a potential conflict, and that Petitioner should be permitted to withdraw. Defendant Richard Stone was present during this hearing. Respondent requested that law and argument on the issue be submitted in writing no later than April 21, and withheld his ruling.

Thereafter, on April 21, Petitioner personally delivered to Respondent his "brief" as well as his written acceptance of the appointment to represent Stone, along with a letter to Respondent stating that such acceptance was being filed "according to the terms of [Judge Walker's] Judgment of Contempt." Later that day, the letter of acceptance was filed with the district clerk.

Respondent, however, did not agree that Petitioner's "acceptance" was in conformity with the Judgment of Contempt [12] and on April 22, issued a written order denying Petitioner's motion to withdraw. Contained in this order were nine "Findings of Fact" [13] concerning "competency of counsel," and the conclusions of law that "William L. White is not disqualified to represent [Stone], is fully competent to perform all duties ... and does not have a conflict of interest in representing the defendant, which would deprive the defendant of his right to effective counsel."

Having received word of Respondent's oral order that Petitioner should be confined, Petitioner's counsel, on Sunday, April 25, contacted Judge Reiter at home by telephone. Respondent advised counsel that he had instructed J. R. Sessions, Sheriff of Freestone County, to expect Petitioner to appear, and to confine him at that time. Counsel told Respondent that if the court were ordering Mr. White to jail, he would voluntarily surrender the following morning, Monday, April 26; Respondent replied that this was satisfactory.

At 8:00 a. m. on April 26, Petitioner appeared at the Freestone County Sheriff's Office. He was stripped and subjected to a body search. He was then given jail garb and placed in a cell at 8:20 a. m.

On the same morning, the original applications for writ of habeas corpus and writ of prohibition before us were presented to this Court on Petitioner's behalf. The cause was ordered filed and set for submission to the Court En Banc on May 26. The Court additionally ordered all proceedings in the trial court stayed pending further orders of this Court. [14] Pursuant to our order, Petitioner was released by the Freestone County Sheriff at 1:30 p. m. on April 26, after being photographed and fingerprinted.

According to an affidavit of Petitioner contained in the record before us, on April 27 he consulted with inmate Stone. At this time, Petitioner advised Stone of his rights and guarantees under the State and Federal Constitutions to the effective assistance of counsel. He advised Stone that these guarantees could be waived by him. Petitioner explained to Stone his opinion that his representation of him would create a conflict of interest, but that Stone could waive the conflict if he understood it. Stone indicated an unwillingness to waive any rights to the effective assistance of counsel. Petitioner consulted with Stone in more detail on the matter on April 28. At this time, Stone executed an affidavit stating he refused to waive any conflict with his own interests which might arise through Petitioner's representation of him and desired conflict free counsel.

---

Petitioner obtained the assistance of The Texas Criminal Defense Lawyers Association, and at this April 15 hearing new counsel made their first appearance.

12. According to briefs of the parties, Judge Reiter called an associate of Petitioner's attorney on April 22 and advised him that there was no opportunity at this point for Mr. White to purge himself and he therefore must now

"tender himself to the Sheriff of Freestone County and serve the punishment as assessed by Judge Walker."

13. These findings are paraphrased and discussed *post* in Part II. C.

14. This Order of the Court was reduced to writing on May 3, 1982.

As stated *ante*, Petitioner is represented by The Texas Criminal Defense Lawyers Association, and has filed, in addition to his original applications and affidavits by himself, his counsel and inmate Stone, a "Brief for Petitioner." Sheriff J. R. Sessions is represented in this Court by Freestone County Attorney, Robert W. Gage, and has filed a "Respondent's and State's Answer."[15] And finally, the Honorable Putnam Kaye Reiter, Judge of the 87th Judicial District Court, Respondent here, has filed a "Motion for Leave to File Brief by Amicus Curiae," a "Brief by Amicus Curiae" and a "Brief by the District Court," alleging in the motion for leave that, "[t]he trial court has asked for representation by the traditional proponents of the court, but such has not been forthcoming. Therefore the offended tribunal . . . is without an advocate before the Court of Criminal Appeals, unless the trial court is permitted to file an amicus curiae brief." We have considered assertions made by Respondent in his briefs in ascertaining matters of fact. Article 1806, V.A.C.S.

### I.  *Habeas Corpus*

■ Turning first to Petitioner's application for habeas corpus, brought to contest Judge Walker's March 9 Judgment of Contempt, *inter alia*, we find merit in the contention that Respondent unlawfully restrained Petitioner pursuant thereto by verbally ordering his confinement in the Freestone County Jail on April 26. *Ex parte Alderete*, 83 Tex.Cr.R. 358, 203 S.W. 763 (1918). "It is well settled that a written order of commitment, which is the warrant . . . by which a court directs a ministerial officer to take a person to jail and to detain him there, is an essential prerequisite to the imprisonment of a person for contempt." *Ex parte Hardin*, 161 Tex. 567, 344 S.W.2d

152, 153 (1961); see also *Ex parte Baize*, 453 S.W.2d 185 (Tex.Civ.App.—Eastland 1970, no writ); and Article 43.11, V.A.C.C.P.; cf. *Todd v. State*, 598 S.W.2d 286 (Tex.Cr.App. 1980).

Thus, we are constrained to reject Respondent's argument made in reply to this contention that Petitioner "voluntarily, without request for hearing, and without objection presented himself to the Freestone County Sheriff for incarceration." There being no written instruction in any form to the Sheriff of Freestone County to confine Petitioner pursuant to the Judgment holding him in contempt included in the record before us, Petitioner is ordered released.

### II.  *Prohibition/Mandamus*

The matter, however, does not end here. Petitioner also has before this Court an application for extraordinary relief denominated "writ of prohibition" which seeks a review of Respondent's ultimate denial of his motion to withdraw from representing Richard P. Stone and a prohibition of the enforcement of Respondent's order appointing him.

We doubt the propriety of Petitioner's first chosen remedy for contest of Judge Reiter's order appointing him to represent Stone, *viz*: refusal to accept the appointment, contempt and habeas corpus;[16] furthermore, a thorough review of the record clearly reveals the tenacity with which all parties to this litigation are committed to pursuing it—well beyond our disposition today if necessary. Thus, it may be seen there are compelling reasons that this Court fully and completely adjudicate Petitioner's application for extraordinary relief; and, indeed, the least of these is not the collateral effect this litigation has had, continues to

---

**15.** The State in this Court asserts that it "takes no position as to the merit or lack of merit of Petitioner's contention that he should be relieved as Richard P. Stone's counsel," and quite correctly characterizes its own position as being "caught in the middle and unable to perform its duty."

**16.** The weight of authority is to the effect that even an order of a court which is patently legally insupportable may not be appropriately

contested by a refusal to comply; see *Maness v. Meyers*, 419 U.S. 449, 95 S.Ct. 584, 43 L.Ed.2d 574 (1975); *United States v. Leyva*, 513 F.2d 774 (CA5 1975); though an order entered by a court which is utterly without authority to enter it, may not be enforced by contempt. *Ex parte Gorena*, 595 S.W.2d 841 (Tex.1979); see also *Ex parte Davis*, 171 Tex.Cr.R. 629, 353 S.W.2d 29 (1962).

have and will otherwise in the future have upon the integrity of the prosecutions presently pending in Freestone County against Richard P. Stone.

### A. Specific Nature of Extraordinary Remedy Sought

■ It is now settled that in determining the specific nature of the extraordinary remedy sought, this Court is not bound by the denomination contained in the pleadings, but will look to the essence of the pleadings, including prayers, as well as the entire record before us. *Garcia v. Dial*, 596 S.W.2d 524 (Tex.Cr.App.1980); *Vance v. Clawson*, 465 S.W.2d 164 (Tex.Cr.App.1971); and see, e.g., *Broggi v. Curry*, 571 S.W.2d 940 (Tex.Cr.App.1978).

> "The writ of prohibition appropriately issues to 'prevent the commission of a future act and not to undo, nullify, or review an act already performed; it will not be granted when the act sought to be prevented is already done, but will lie when such act is not a full, complete, and accomplished judicial act.' *Vance v. Clawson*, at 168, 169; *Smith v. Blackwell*, 500 S.W.2d 97 (Tex.Cr.App.1973)."

*Garcia v. Dial*, supra, at 529. Because Petitioner essentially seeks a writ from this Court which would set aside Judge Reiter's order appointing him to represent Stone, the relief sought is mandamus. Compare *Garcia v. Dial*, supra and *Vance v. Clawson*, supra, with *LeBlanc v. Gist*, 603 S.W.2d 841 (Tex.Cr.App.1980).

### B. No Adequate Remedy at Law

"Mandamus is only available where no other adequate remedy at law is available." *Vance v. Routt*, 571 S.W.2d 903, 907 (Tex. Cr.App.1978).

It is urged by Judge Reiter's brief that if a conflict of interest exists in Petitioner's representation of Stone, that it is *Stone* and he alone who has a right to complain. Implicit in this argument is the corollary that, should Stone be convicted in one or both criminal causes, a direct appeal from such conviction(s) would constitute a remedy adequate to adjudicate the conflict issue raised in this extraordinary action. We disagree.

Assuming arguendo that the conflict urged by Petitioner exists but Petitioner nevertheless vigorously undertakes the defense of his client, it is true that Stone's constitutional right to conflict free counsel would be vindicated by a direct appeal, albeit after the expense, anxiety and dissipation of judicial resources incident to a voidable proceeding. Cf. *Garcia v. Dial*, supra. But patently such an appeal would do nothing to rectify the damage done to the interests of every other indigent inmate of T.D.C. who, by necessity, must rely on the cooperative relationship between staff counsel and other T.D.C. employees for speedy, often informal, effectuation of *their* legal rights.[17]

Moreover, again for the sake of argument, if we assume that, notwithstanding the conflict, Petitioner is so effective in his zealous defense of Stone that the latter is acquitted, how then could the conflict ever be reviewed? Clearly, it could not, yet, again, the interests of all other indigent clients of the staff counsel would be left in a dire state, a result of the shattered relationship between Petitioner and his fellow employees, some of whom he had successfully revealed to have acted illegally, or at least, to have testified less than truthfully, during his defense of Stone. This strikes us as an example of winning a battle while losing the war.

■ In sum, we cannot agree that Stone has the only interests which may be affected by the action before us. We hold that no other remedy is adequate to dispose of the issue raised under the circumstances presented in this extraordinary proceeding.[18]

### C. Discretionary Act?

■ It is also well settled that mandamus will not issue to compel a particular result

---

17. One need only imagine the myriad ways in which T.D.C. security, records and other personnel could—if so inclined—obstruct the work of 13 staff counsel attorneys attempting to serve the indigents of the more than 33,000 Texas prison inmate population.

18. Accord *United States v. Garcia*, 517 F.2d

in what is manifestly a discretionary decision, *Garcia v. Dial*, supra; see, e.g., *Williams v. Placke*, 587 S.W.2d 166 (Tex.Cr. App.1979); and *Ordunez v. Bean*, 579 S.W.2d 911 (Tex.Cr.App.1979), though mandamus may be appropriate to impel the consideration of a motion, the issuance of a ruling, an entry of a judgment or other act, the doing of which is not discretionary. *Id.*

Thus, in order to determine whether extraordinary relief will lie here, it is essential that we examine not only the order denying Petitioner's motion to withdraw, but also the precise issue presented by that motion, as well as the bases expressed by Judge Reiter for his ruling.

As was observed *ante*, Respondent entered nine written findings of fact on which his ruling was based; paraphrased, those findings are:

(1) Stone is incarcerated in T.D.C.;

(2) Stone is indicted for a felony offense "with uncomplicated facts;"

(3) Stone is indigent and has requested appointment of counsel;

(4) The court appointed William L. White to represent Stone;

(5) White is employed by the State "substantially the same as prosecuting attorneys, assistant attorney generals [sic], district and appellate judges, at least as regards to salary;"

(6) White does not represent the State or employees of T.D.C., but only convicts;

(7) White engages in some private practice and has on prior occasions been appointed to represent indigents "without any question as to his competency;"

(8) White has previously appeared in this court representing T.D.C. convicts "without any question as to his competency;"

(9) White is a duly licensed member of the State Bar of Texas and "[is] in general competent to practice criminal law in this Court."

Respondent's written conclusions of law which purported to compel denial of Petitioner's motion to withdraw are: (1) Petitioner is not *disqualified* to represent Stone; (2) Petitioner is *competent* to perform all duties of counsel for the defense; and, (3) Petitioner does not have a conflict of interest in representing Stone which would deprive Stone of his right to the effective assistance of counsel.

While it is clear Respondent's written fact findings support his first and second conclusions of law above, it is equally apparent that none of those findings supports the third conclusion, that no conflict of interest which could implicate Stone's Sixth Amendment right to the effective assistance of counsel exists.[19]

From the briefs filed by Respondent in this Court, it is apparent that the only basis

272, 275 (CA5 1975), in which the threshold question was whether a district court order determining a conflict of interest disqualified defense counsel, made pretrial on motion of the adverse party, was appealable. The Fifth Circuit, quoting the Supreme Court, held that such an order, though not a "final judgment" in the traditional sense,

"involves a claim 'separable from, and collateral to, rights asserted in the action, too important to be denied review and *too independent of the cause itself* to require that appellate consideration be deferred until the whole case is adjudicated.' [*Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 546, 69 S.Ct. 1221, 1225, 93 L.Ed. 1528 (1949) * * *]. In this case, deferral of review until after completion of the trial would dissipate judicial resources and possibly jeopardize the defendant's case. . . . "

**19.** It is true that an attorney's "disqualification" would be due to a "conflict of interest," but patently, not every "conflict of interest" constitutes a "disqualification," the latter being generally a set of circumstances in which the attorney in question does have, or has had, an attorney client relationship with two or more *parties* to litigation whose interests, by virtue of the litigation are now adverse. See *Pioneer Natural Gas Co. v. Caraway*, 562 S.W.2d 284 (Tex.Civ.App.—Eastland 1978, writ ref'd, n.r. e.). In the overwhelming majority of cases a motion to "disqualify" an attorney is made by the *adverse party*. See *id.*, and cases cited there.

Thus, Respondent's finding that Petitioner does not represent T.D.C. or employees of T.D.C., while responsive to the question of "disqualification," in no way disposes of the

for the conclusion that no potential or present conflict of interest exists in Petitioner's representation of Stone is that "Mr. White's superior, W. J. Estelle, Jr., stated he had no objection to the appointment . . . and that it would not interfere or conflict with his duties as Director of Staff Counsel for Inmates."

With all due respect to Mr. Estelle, this Court is unprepared to defer to his determi-

nation (if, indeed, he made one; see n. 4, *ante*) of an issue which is appropriately made only after careful consideration of all relevant facts and circumstances by a member of the judiciary;[20] it follows that Respondent's conclusion upon the issue is not supportable by the fact that the Director of T.D.C. was unable to perceive a conflict six weeks after Stone's alleged commission of the offenses in question.[21] Indeed, we find no evidence at all in the record before us

"conflict of interest" issue raised by Petitioner's motion and evidence.

Furthermore, Judge Reiter's findings that Petitioner is a "competent" criminal lawyer in general wholly avoids the issue of whether the unique *facts* involved in the prosecutions of Stone might create a division of loyalty for Petitioner which could adversely affect his advocacy of Stone's interests.

**20.** It does appear, however, that Estelle's expressions on the matter do directly rebut Petitioner's contention he could not perform all tasks necessary to the representation of Stone on State time and with the use of State vehicles.

But by the same token, the fact that his communication with Estelle was the determinative factor on which Respondent entered the written order appointing Petitioner to represent Stone clearly does not support Respondent's repeated assertion that he was appointing Petitioner in his "individual capacity" as opposed to his capacity as a staff counsel attorney whose function it is to represent indigents confined in T.D.C.

**21.** Attention is called to the following provisions of the State Bar of Texas, Rules and Code of Professional Responsibility:

"EC 5–1. The professional judgment of a lawyer should be exercised, within the bounds of the law, solely for the benefit of his client and *free of compromising influences and loyalties.* Neither his personal interests, the interests of other clients, nor the desires of third persons should be permitted to dilute his loyalty to his client."

"EC 5–21. The obligation of a lawyer to exercise professional judgment solely on behalf of his client requires that he *disregard the desires of others that might impair his free judgment.* The desires of a third person will seldom adversely affect a lawyer unless that person is in a position to exert strong economic, political, or social pressures upon the lawyer. These influences are often subtle, and a lawyer must be alert to their existence. A lawyer subjected to outside pressures should make full disclosure of them to his client; and if he or his client believes that the effectiveness· of his representation has

been or will be impaired thereby, the lawyer should take proper steps to withdraw from representation of his client."

"EC 5–22. Economic, political, or social pressures by third persons are less likely to impinge upon the independent judgment of a lawyer in a matter in which he is compensated directly by his client and his professional work is exclusively with his client. On the other hand, *if a lawyer is compensated from a source other than his client, he may feel a sense of responsibility to someone other than his client.*"

"EC 5–23. A person or organization that pays or furnishes lawyers to represent others possesses a potential power to exert strong pressures against the independent judgment of those lawyers. Some employers may be interested in furthering their own economic, political, or social goals without regard to the professional responsibility of the lawyer to his individual client. Others may be far more concerned with establishment or extension of legal principles than in the immediate protection of the rights of the lawyer's individual client. On some occasions, decisions on priority of work may be made by the employer rather than the lawyer with the result that prosecution of work already undertaken for clients is postponed to their detriment. * * Since a lawyer must always be free to exercise his professional judgment without regard to the interests or motives of a third person, the lawyer who is employed by one to represent another must constantly guard against erosion of his professional freedom."

"EC 5–24. Where a lawyer is employed by an organization, a written agreement that defines the relationship between him and the organization and provides for his independence is desirable since it may serve to prevent misunderstanding as to their respective roles. Although other innovations in the means of supplying legal counsel may develop, *the responsibility of the lawyer to maintain his professional independence remains constant,* and the legal profession must insure that changing circumstances do not result in loss of the professional independence of the lawyer."

which would support Judge Reiter's conclusion that no potential conflict is presented by the relationship between Petitioner and the State's primary witnesses against Stone in Petitioner's representation of Stone.

Like Respondent's written findings and conclusions, the focus reflected by his briefs without ambiguity is upon whether Petitioner is "disqualified" or is presently "incompetent" as a criminal attorney.

But we are unable to see from Petitioner's motion to withdraw or any arguments advanced that Petitioner has ever claimed that he is "disqualified" to represent Stone or is "incompetent" to represent one criminally accused in general. See n. 19, *ante.*

### III. *Remedy*

In sum, the record reflects no consideration by Respondent of the precise issue raised by Petitioner's motion to withdraw. It is not within Respondent's discretion to pretermit consideration of that issue, an issue which is of constitutional magnitude, and the erroneous determination of which would result in a gross dissipation of judicial resources. Accordingly, it is an appropriate use of this Court's power to issue the writ of mandamus, that we now order Respondent to consider the conflict of interest question raised by Petitioner's motion to withdraw and enter *de novo* findings and conclusions on *that* issue.

The record establishes that attorneys employed as staff counsel are prohibited by contract from representing persons whose legal interests are adverse to T.D.C. or T.D.C. employees acting within the scope of their employment. See n. 3, *ante.* Therefore, in complying with this Court's order, Respondent must determine from the evidence whether the unique facts [22] comprising Stone's alleged escape from T.D.C., his alleged commission of the offenses in question, his arrest and any other issue which might arise in Stone's prosecution, will place Petitioner in a position of advocating "legal interests [which] are adverse to T.D.C. or T.D.C. employees acting within the scope of their employment," and thereby put Petitioner in breach of his contract with T.D.C.[23] If Petitioner's choices are that he zealously represent Stone or breach his contract with T.D.C., the conflict is patent.

While the overwhelming majority of cases dealing with conflict of interest in the context of a criminal trial address fact situations in which an attorney has jointly represented multiple accused, we caution Respondent against discounting the reasoning of those decisions under the notion that the juxtaposition of the interests are different than those presented here. It should be remembered that our overriding concern must be the protection of Stone's constitutional right to conflict free counsel.[24]

If counsel's obligation is to determine whether in his professional judgment a conflict of interests exists without regard to the judgments of his employer, surely the trial judge, when presented with the question, is obliged to do no less. See also DR5–107(B).

22. A finding that the facts in question are "uncomplicated" has not a modicum of relevance to the issue to be resolved.

23. The record indicates that the staff counsel's contract with T.D.C. is a prophylactic measure precipitated by an awareness of the untenable position those attorneys would be in were they allowed to pursue civil rights claims against T.D.C. on behalf of inmates in which it was alleged and, perforce, *must be proved* that other T.D.C. employees had acted unlawfully, thereby violating the constitutional rights of those in their charge.

While the State prosecutions pending against Stone are not federal civil rights suits, the very

policy interest advanced by the contract—that staff counsel lawyers should never be in the posture of attempting to prove other T.D.C. employees have acted illegally—is heavily implicated by the facts determinative of the issue we commend to Respondent for resolution; it therefore behooves Respondent to consider and determine the issue within this framework.

24. "... [R]epresentation of conflicting interests is suspect because of *what it tends to prevent the attorney from doing.* * * * Generally speaking, a conflict may also prevent an attorney from challenging the admission of evidence prejudicial to one client * * *. Examples can be readily multiplied. The mere physical presence of an attorney does not fulfill the Sixth Amendment guarantee when the advocate's conflicting obligations have effectively sealed his lips on crucial matters.

* * * But in a case of joint representation of conflicting interests the evil—it bears re-

The affirmative duty upon an attorney to advise the court of any conflict, actual or potential, extant in his representation of a defendant has been performed by Petitioner. See *Holloway v. Arkansas,* 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978); *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *Pete v. State,* 533 S.W.2d 808 (Tex.Cr.App.1976); see also State Bar of Texas Rules and Code of Professional Responsibility (hereinafter C.P.R.) DR 5–105. And though it appears no duty devolves on the trial court to sua sponte inquire, *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), the authorities agree that great deference should be accorded the representations of an attorney that he feels a division of loyalty. In *Holloway v. Arkansas,* supra, 435 U.S. at 485–486, 98 S.Ct. at 1179–1180, the Supreme Court observed,

"... [S]ince the decision in *Glasser,*[25] most courts have held that an attorney's request ... based on his representations as an officer of the court regarding a conflict of interests, should be granted. * * * In so holding, the courts have acknowledged and given effect to several interrelated considerations. An 'attorney ... is in the best position professionally and ethically to determine when a conflict of interest exists or will probably develop in the course of a trial.' * * * Second, defense attorneys have an obligation, upon discovering a conflict of interests, to advise the court at once of the problem. * * * Finally, attorneys are officers of the court, and ' "when they address the judge solemnly upon a matter before the court, their declarations are virtually made under oath." ' * * * We

peating—*is in what the advocate finds himself compelled to refrain from doing,* not only at trial but also as to possible pretrial plea negotiations and in the sentencing process. [Even with a complete record] it would be difficult to judge intelligently the impact of a conflict on the attorney's representation of a client. And to assess the impact of a conflict of interests in the attorney's options, tactics, and decisions in plea negotiations would be virtually impossible. Thus, an inquiry into a claim of harmless error here would require, unlike *most cases,* unguided speculation."

find these considerations persuasive." [Citations, footnotes and emphasis deleted.]

In *Holloway,* supra, it was the State's contention that such deference to representations of an attorney would allow "unscrupulous defense attorneys" to abuse the situation, presumably for purposes of delay or obstructing orderly proceedings. The Supreme Court, however, made it clear that a trial court is free to decide no conflict of interest exists where there is no factual support for the attorney's claim *and* there is affirmative evidence of dilatory intent. *Id.* But clearly, an *ab initio* presumption by the trial court that counsel's representations are motivated by bad faith is prohibited.

In complying with this opinion, Respondent is directed to enter new findings of fact which are relevant to the issue as circumscribed herein, based on all the evidence heretofore adduced and new conclusions of law supportive of any ruling to be made on Petitioner's motion to withdraw; Respondent is further directed to forward such findings and conclusions by way of supplemental transcript to this Court.

Having determined that Petitioner is entitled to Respondent's plenary consideration of the conflict of interest issue raised by his motion to withdraw from court appointed representation of Richard P. Stone, within the framework of his contract agreement with T.D.C.,[26] and under the unique facts to be developed in the prosecutions pending against Stone, as well as in light of both our State Rules and Code of Professional Responsibility and the Sixth Amendment right to conflict free counsel,[27] we hold it is ap-

*Holloway v. Arkansas,* infra, 435 U.S. at 489–491, 98 S.Ct. at 1181–1182. See also *Wood v. Georgia,* 450 U.S. 261, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981).

**25.** *Glasser v. United States,* supra.

**26.** Respondent's attention is directed to n. 3, *ante,* for the terms of this contract, as reflected in our record.

**27.** It is apparent from the record that Respondent has never had the benefit of the sworn

propriate to issue the writ of mandamus to that end. Cf. *Wood v. Georgia*, 450 U.S. 261, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981).

However, the writ will issue only in the event of a failure to comply with the directives contained herein, since we presume Respondent will act accordingly.

ROBERTS, ODOM and TOM G. DAVIS, JJ., concur in result.

ONION, Presiding Judge, concurring.

I concur in the results reached but do not join in all the language and reasoning of the majority opinion. I write only to express my concern for the unnecessary consumption of the judicial resources in this case [1] merely to determine whether the petitioner should have been required to continue with his appointment as counsel for Stone. Surely, early on, it became clear that a serious question about the appointment was involved which could cause the granting of a new trial or a reversal on appeal. Practicality should play an important part in our judicial system and district judges should make the extra effort to remove any question for reversal when it can be easily done, even when the judge does not regard the question a serious one. The granting of a new trial or a reversal on appeal resulting in a second trial is costly to the taxpayers and delays justice. Judicial wheel spinning should be avoided.

I concur.

TEAGUE, J., joins in this opinion.

averments contained in the affidavit of Richard P. Stone, which are highly relevant to the consideration we order. See CPR, EC5–16, and EC5–21.

1. Three district judges and nine appellate judges were all involved in the process involving research by this court. This does not consider the time consumed in briefing the question by the parties and the delay of the trial.

1. All emphasis is supplied throughout by the writer of this opinion unless otherwise indicated.

## OPINION

CLINTON, Judge.

Pursuant to our opinion delivered July 21, 1982 (hereinafter Opinion), in which we remanded this cause, the Honorable Putnam Kaye Reiter, Judge of the 87th Judicial District Court and Respondent here, has forwarded to this Court a supplemental transcript containing what profess to be *de novo* findings of fact and conclusions of law supporting his refusal to grant a motion to withdraw as appointed counsel for Richard P. Stone, on the ground of conflict of interest, filed by Petitioner, William Louis White.

The conclusion of law made by respondent which is offered to dispose of the issue of whether a conflict of interest could arise in Petitioner's representation of Stone, is:

"There exists no conflict of interest *which would render Counsel ineffective* in Mr. William Louis White representing Defendant Richard P. Stone in the trial of the two indictments presently pending in the 87th Judicial District Court of Freestone County." [1]

This conclusion assumes that a conflict of interest necessitating Petitioner's withdrawal as counsel, would arise only if it be shown his representation would result in ineffective assistance to Stone.[2] We fail to see in what manner such a showing might be made or refuted at this pretrial stage of the prosecutions against Stone. Indeed, the Supreme Court of the United States has made it clear that undertaking such an inquiry even after a criminal trial is complete, is the equivalent of "unguided speculation." *Holloway v. Arkansas,* 435 U.S.

2. The conclusion of law in question has been merely reworded by Respondent from its original form to place emphasis on a necessity that a pertinent conflict of interest confronting Petitioner must operate to render his future assistance to Stone ineffective. In our Opinion on original submission, we stated only that the conclusion in its original form was not supported by the findings or the record. Respondent apparently read our statement to say that such a conclusion was otherwise correct; we did not.

475, 491, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978). Futhermore, as was discussed in Part II–B of the Opinion, there are contexts in which conflicts of interests can arise, other than in the criminal prosecutions of Stone.

We also noted apparently sworn testimony given by Petitioner at the April 1 hearing before Judge David Walker. Opinion at 6–7. Petitioner testified it was his understanding T.D.C. employees set up a road block on a public highway which resulted in Stone's arrest and perforce, a seizure of evidence of his commission of crimes for which he had been indicted; it was also Petitioner's understanding that T.D.C. officials have no legal authority to so stop a vehicle; Petitioner offered his professional opinion that the validity of Stone's arrest would therefore be litigated and the attorney representing Stone would necessarily be called upon to establish the arresting T.D.C. personnel had acted illegally or were testifying falsely. Petitioner further testified, as facts, that due to the nature of the objectives of the Staff Counsel for inmates, the relationships between staff counsel attorneys and other T.D.C. employees, were at times tenuous; that the success of many pursuits on behalf of indigent T.D.C. inmates was dependent on the day to day cooperation of the staff's fellow T.D.C. employees.

Finally, Petitioner gave testimony that it was his "fear" that, if he were the attorney assailing the legality of his fellow T.D.C. employees' acts in arresting Stone, the discord created thereby would affect the future effectiveness of legal representation to be provided all *other indigent inmates* who might obtain assistance from the Staff Counsel for inmates, which might be to any degree dependent on cooperation of other T.D.C. personnel, and that he doubted any attorney in his position could undertake representation of Stone without an attitude of divided loyalty.

■ These representations by Petitioner are entitled to great deference and, as we understand the Supreme Court's pronouncements, Respondent is compelled to defer to them unless there is no factual support for them and there is affirmative evidence of dilatory intent. *Holloway v. Arkansas,* supra.[3] In our Opinion we observed we had found "no evidence at all" in the record to support Respondent's conclusion that no potential conflict is presented by the relationship between Petitioner and the State's primary witnesses against Stone, in Petitioner's representation of Stone.

Thus, we remanded this cause to give Respondent an opportunity to reevaluate all evidence which had been adduced, so that he might for the first time determine whether any factual basis could be found which would support the legal conclusion that there were no conflicts of interests extant in the juxtaposition of the unique facts involved in the arrest of Stone, and the personal and professional aspects of the relationships between Petitioner and other T.D.C. employees.[4]

Thereafter, on August 12, 1982, we denied Petitioner leave to file a motion for issuance of the writ of mandamus which sought to prevent Respondent from adducing additional evidence he deemed relevant to the issue, but ordered Respondent's compliance with our Opinion no later than September 1, 1982. But Respondent had by that time already convened a hearing, over

---

**3.** While we are in general accord with the recitation prefacing Respondent's *"de novo"* findings, that he is "the sole and exclusive judge of the credibility of witnesses and the weight to be given their testimony," it is clear that the Supreme Court has provided mandatory guidelines for a trial court's judging the credibility of, and the weight to be given, solemn representations by an officer of the court, that he feels or fears a division in his loyalty. In short, absent evidence of dilatory intent coupled with no factual basis for the attorney's representa-

tion, a trial judge does not have the discretion to ignore, or give no weight to, those representations. *Id.*

**4.** We fear Respondent may have misapprehended our meaning in using the phrase "unique facts." Of course, each and every case is composed of "unique facts," and it was to those comprising the alleged transgressions, and subsequent apprehension, of Stone, which we made reference.

the objection of Petitioner, on August 5, 1982.

It is clear then, that Respondent has not only been given an opportunity to find a factual basis for his original conclusion that Petitioner's representation of Stone vis-a-vis his relationship with Stone's primary accusers does not present a conflict of interests, but he has also taken an opportunity to adduce additional factual support therefor. The transcription of the court reporter's notes from the August 5 hearing, however, reflects only the testimony of Gerald G. Fall, Jr., General Counsel to the Texas Department of Corrections, which does nothing more than amplify evidence already adduced, that Petitioner's employer, W. J. Estelle, Jr., approved Petitioner's representation of Stone—a fact this Court has earlier made clear is not controlling of the constitutional question presented in this cause.[5] Opinion at 19–20, n. 21 (wherein it was stated the trial court had an obligation to determine whether a conflict of interests exists without regard to the judgments of Petitioner's employer).

██ But no evidence was adduced which would belie the factual support for Petitioner's representations, such as that T.D.C. employees were not involved in Stone's arrest or that T.D.C. employees have nothing to do with the smooth effectuation of the staff counsel's objectives as lawyers of indigent convicts. And, the only "finding" before us which is relevant to the juxtaposition of Petitioner's interests is:

"There is no factual distinction between Mr. William Louis White's appointment to represent Defendant Richard P. Stone and having to vigorously examine his employer's personnel, and any other appointed counsel having to vigorously examine county and state law enforcement personnel."

We perceive no "finding of fact" in this assertion. And to say, as a matter of judicial knowledge, that there is no difference between an attorney's taking an adversary role against people with whom he must work, associate and cooperate daily, and taking such a position against law enforcement officials with whom he does not associate or work *other than* in an adversarial capacity, does not comport with common experience.[6]

Neither was any evidence elicited at the hearing which would indicate a dilatory intent on Petitioner's part in moving for his withdrawal as counsel for Stone. The only finding which could be construed as relevant to a dilatory intent on Petitioner's part is:

"Through his intentional efforts to avoid representing Defendant Richard P. Stone, Mr. William Louis White has delayed the trial of ... Stone time and again, for over six months. Mr. White has made only minimal effort to prepare for trial. Mr. White has only contacted ... Stone to gain support for [his] efforts to be discharged as appointed counsel."

Thus, Respondent has not made a finding that Petitioner's action in seeking to withdraw constitutes a bad faith effort to delay Stone's prosecutions, and we find no sup-

---

**5.** Apparently construing our statement that a breach of Petitioner's employment contract with T.D.C. would establish a "patent conflict" posited the ultimate issue, the County Attorney caused Mr. Fall to appear and testify that a document entitled "Inmate Legal Assistance Program Policy, Rules and Regulations," was *not* a binding contract governing the employment of staff counsel; that at most an "implied contract" arises from its terms; that W. J. Estelle could unilaterally and at will modify or amend these rules and regulations; that it was Fall's opinion Estelle had created an amendment when he approved Petitioner's representation of Stone, and finally, that such would govern any conflicting term of the policy state-

ment. Notwithstanding the fact that the unambiguous terms of that statement refute Fall's assertions on virtually every count, we will assume for the sake of argument his testimony established "no contract."

But, while a clear violation of the patent terms of a written agreement would establish a conflict of interests, not all conflicts of interest exist within that context. Thus, the fact that no contract exists between Petitioner and T.D.C., does not terminate the inquiry.

**6.** This Court can no more defer to this "finding" than we could had Respondent simply stated "no conflicts of interests ever exist in fact."

port in the record for such a finding in any event.

In our prior consideration of this cause, we found it unnecessary to reach the question of whether the relief sought by Petitioner constitutes a result which is within the sound discretion of Respondent, or one which is essentially a ministerial act, and therefore, compelled by mandamus. This was so because Respondent had not yet performed the ministerial duty appropriate to his office of considering a constitutional question squarely raised by a motion. This ministerial duty has still not been performed.

In view of what we previously characterized as the "collateral effect this litigation has had, continues to have and will ... have upon the integrity of the prosecutions presently pending in Freestone County against Richard P. Stone" as long as it continues, and the understanding displayed by Respondent in his findings that time is of the essence, it is plain that he has abnegated his responsibility to consider the issue raised herein. We accordingly proceed to determine if the decision of whether to relieve Petitioner of his appointment as counsel for Stone, is manifestly discretionary. *Garcia v. Dial,* 596 S.W.2d 524 (Tex. Cr.App.1980).

In *Knowles v. Scofield,* 598 S.W.2d 854, 860 (Tex.Cr.App.1980), we stated:

> "We agree that the writ [of mandamus] 'issues to require the execution of a matter whose merit is beyond dispute, and may not be employed as scales in which to balance the weight of evidence or to bridge the gap between broken and disconnected facts.' *Wortham v. Walker* [133 Tex. 255, 128 S.W.2d 1138, 1151 (1939)]."

Further, we have noted an exception to the general rule that mandamus will not issue to compel a specified judgment:

> "A Court 'may be directed by mandamus to enter a particular judgment if that judgment is the only proper one that can be rendered under the circumstances and there is no other adequate remedy.' [Citations omitted.]"

*Vance v. Routt,* 571 S.W.2d 903, 907 (Tex. Cr.App.1978).

We have already stated in n. 3, *ante,* that it is not within Respondent's discretion to give no weight to, or ignore completely, the representations of Petitioner regarding his feelings of divided loyalty. And since no evidence is contained in the entire record before us which even the most liberal construction might lend to support the propositions that no factual basis exists for Petitioner's attitude,[7] or that Petitioner's position is motivated by bad faith or dilatory intent, it is clear, as a matter of constitutional law,[8] that the only proper order which can be issued under the circumstances, is one which relieves Petitioner of his appointment to represent Richard P. Stone. Compare *Garcia v. Dial,* supra; *Vance v. Routt,* supra; and *Vance v. Clawson,* 465 S.W.2d 164 (Tex.Cr.App.1971), with *Knowles v. Scofield,* supra.

We are constrained to issue the writ of mandamus.

It is so ordered.

ROBERTS and ODOM, JJ., concur in result.

---

7. Indeed, all relevant evidence is to the contrary.

8. *Holloway v. Arkansas,* supra.